EGBERT J. MILES AND JEAN N. MILES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67209. Filed February 13, 1959.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

*Richard W. Wilson, Esq.*, for the petitioners.
*John M. Doukas, Esq.*, for the respondent.

BRUCE, *Judge:* This proceeding involves a deficiency in income tax of $17,261.71 for 1953. The only issue is whether petitioner is entitled to deduct $31,309.41 as interest paid in 1953 pursuant to section 23(b), I.R.C. 1939.

### FINDINGS OF FACT.

During the year in issue the principal petitioner, Egbert J. Miles, and his wife, Jean, resided in Woodbridge, Connecticut. They filed a joint income tax return for the year 1953 with the district director of internal revenue for the district of Connecticut. Petitioners reported their income on the cash basis.

In 1953 petitioner was an executive and stockholder of a corporation manufacturing women's foundation garments. He and his wife reported income from salaries and other sources totaling $59,496.72. Petitioner was not a security dealer.

At all times pertinent hereto M. Eli Livingstone was a security dealer in Boston, Massachusetts, doing business in the form of a sole proprietorship under the name of Livingstone & Company. Gail Finance Corporation, hereinafter referred to as GFC, was a Massachusetts corporation allegedly doing business as a finance company in Harry N. Cushing's law offices at 70 State Street, Boston, Massachusetts. Cushing is a longtime friend and former law partner of Livingstone. At all times material hereto Cushing was president and treasurer of GFC.

Petitioner received information about the bond investment plan herein involved from Gustave Simons, an attorney. Simons assured petitioner that he could arrange the necessary financing and that bonds could be purchased through Livingstone & Company. In the latter part of 1953 petitioner embarked upon a series of transactions which *in form* were as follows:

On December 15, petitioner purchased from Livingstone & Company $175,000-face-value United States Treasury 2¾ per cent bonds due September 15, 1961, with March 15, 1959, and subsequent coupons attached. Livingstone & Company sold the bonds to petitioner in a short position as "principal" and did not charge petitioner a commission on the sale. The purchase price of the bonds was 86⅞ or a total of $152,031.25.

On or about December 16 petitioner borrowed $175,875 from GFC to finance his purchase of the Treasury bonds. Petitioner did not go to Boston to negotiate for the loan and did not meet Cushing until shortly before the trial of this case. The loan was arranged through some member of Simons' law firm and through Livingstone. Petitioner pledged the Treasury bonds as security for the loan and executed a nonrecourse promissory note which read as follows:

$175,875.00

On September 15, 1958, I promise to pay to the Gail Finance Corp., a Massachusetts corporation with its principal office in Boston, Massachusetts (hereinafter referred to as the obligee) the sum of—

ONE HUNDRED SEVENTY-FIVE THOUSAND EIGHT HUNDRED SEVENTY-FIVE AND NO/100 DOLLARS

Interest in the amount of $31,309.41 having been prepaid by me; subject to the following rights and conditions, having deposited with the said obligee the following securities as collateral:

$175,000 U.S. Treasury 2¾% Notes of 9/15/61 with March 15, 1959 and subsequent coupons attached

The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein, and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the principal and interest due hereunder.

The undersigned shall not be called upon nor be liable to furnish additional collateral to the obligee at any time.

The undersigned may anticipate payment, in whole or in part, at any time, of the amount due hereunder, and shall receive back a pro rated portion of the collateral so held; provided nevertheless that interest at the rate of 1% per annum pro rated to the maturity date shall be charged on the amount or amounts so paid by anticipation.

All payments received by the obligee directly from or indirectly for the account of the undersigned shall be applied first to payment of interest and any balance thereof applied to payment of principal due hereunder as the obligor shall elect.

The undersigned shall not in any event be personally liable to pay any of the principal indebtedness hereof or interest arising hereunder (including the penalty interest of 1% per annum for prepayment) except from the proceeds from the sale of the said collateral deposited. Application of the proceeds from the sale of the said collateral by the obligee shall be a full accord and satisfaction of any and all claims hereunder and act as a full and complete discharge of any and all liability of the undersigned.

This note shall be interpreted in accordance with a letter dated December 15, 1953 signed by Gail Finance Corp., and the said letter shall hereby be incorporated and made a part of this note.

This note has been entered into in the City of New Haven, and shall be construed and interpreted in accordance with the laws of the State of Connecticut.

/s/ E. J. Miles, Jr. (Seal)

This note and all the terms and conditions hereof accepted this sixteenth day of December, 1953.

> GAIL FINANCE CORP.
> /s/  Harry N. Cushing,
> *Treasurer*

Petitioner wrote Livingstone & Company a letter dated December 15, 1953, which read as follows:

LIVINGSTONE & COMPANY
*10 Post Office Square*
*Boston, Massachusetts*
Gentlemen:
Please deliver to Gail Finance Corp., the following—

$175,000 U.S. Treasury 2¾% Bonds due 9/15/61 with 3/15/59 and subsequent coupons attached

against payment by them to you of $175,875, which is the proceeds of my loan with them.

After reimbursing yourselves in the amount of $152,031.25, please remit the difference to me.

> Very truly yours,
> /s/  E. J. Miles, Jr.
> E. J. MILES, JR.

Livingstone & Company sent petitioner a check dated December 15 in the amount of $23,843.75, representing the difference between the purchase price of the bonds and GFC's loan to petitioner. Petitioner sent GFC a check dated December 26 in the amount of $31,309.41, representing prepaid interest for the entire term of his loan from GFC.

At an undetermined time petitioner inquired as to the identity of the bonds purchased in his behalf by GFC and received a letter from GFC dated February 26, 1954, which read as follows:

MR. E. J. MILES, JR.
*17–53 Oak Street*
*New Haven Connecticut*
Dear Mr. Miles:
In connection with your inquiry please be advised that we have on deposit with Lake View Trust Co. on re-hypothecation from your account:

$175,000 U.S. Treasury 2¾%, 1961

The numbers on these securities are as follows:

13818 for $100,000.
45212/8, for $10,000 each
14406 for $5,000.

> Very truly yours,
> GAIL FINANCE CORP.
> /s/  Harry N. Cushing
> HARRY N. CUSHING
> *Treasurer*

At the time GFC purportedly loaned petitioner $175,875, it had cash on hand totaling $1,865.13. The entries on the books of GFC relating to the Miles transaction are as follows:

12/16/53—(to record Miles' note.)
   (a) *Debit* Notes Receivable Clients $175,875, and
   (b) *Credit* L & Co. (Livingstone and Company) Accounts Receivable $175,875.

12/28/53—(to record receipt of interest from Miles)
   (a) *Debit* Cash $31,309.41, and
   (b) *Credit* Interest Received $31,309.41

2/16/54
   (a) *Debit* L & Co. Accounts Receivable $465,000, and
   (b) *Credit* Notes Payable Banks $465,000.

7/28/55 (to record short sale of same type and amount of Treasury Bonds pledged by petitioner)
   (a) *Debit* L & Co. Accounts Receivable $159,250 and
   (b) *Credit* Short sales $159,250

7/28/55
   (a) Debit Notes Payable Brokers (Banks) $170,100
   (b) Debit Interest $375.76 and
   (c) Credit L & Co. Accounts Receivable $170,475.76

The entry dated February 16, 1954 is accompanied by a notation in a column labeled "Name" saying "Lake View Trust & Sav. Bank," and by a notation in an unlabeled column saying:

| | | |
|---|---|---|
| E. J. Miles | 175M 2¾–61 | 175M |
| M. Hoffman | 200M 3¼–83 | 200M |
| P. Roberts | 90M 3¼–83 | 90M |

Livingstone & Company has an entry in its sales journal as follows:

12/15/53 (to record sale of bonds to Miles)
   (a) *Debit* Accounts Payable $152,031.25, and
   (b) *Credit* Inventory $152,031.25 SS (short sale)

In arriving at his taxable income for 1953 petitioner deducted $31,309.41, representing prepaid interest on his loan from GFC. Respondent disallowed the above deduction, claiming it was not within the scope of section 23(b), I.R.C. 1939.

OPINION.

The only issue is whether petitioner, pursuant to section 23(b), I.R.C. 1939,[1] is entitled to deduct $31,309.41 as interest paid in 1953.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
  In computing net income there shall be allowed as deductions:
    \*     \*     \*     \*     \*     \*     \*
  (b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

Respondent disallowed petitioner's interest deduction. He contends that the series of transactions petitioner embarked upon were not significant for tax purposes because what was done, apart from the tax motive, was not within the intendment of the statute. He further contends that the transactions should be ignored for tax purposes because they were a sham, or if not a sham, because their characterization lacked in commercial or economic reality.

Petitioner argues that his investment in bonds, incurrence of indebtedness, and payment of interest were bona fide business transactions, and that he embarked upon this business venture with the hope of realizing a profit from the bonds' appreciation in market value. He argues further that section 23(b) does not require the indebtedness to be incurred for a business purpose or in the production of income, and that once a taxpayer has established an indebtedness the statute places no further restrictions or conditions on the deductibility of interest which are pertinent to the instant case.

It has long been recognized that literal compliance with the terms of a taxing statute is not always enough to bring a transaction within its scope. In *Gregory* v. *Helvering*, 293 U.S. 465, the parties' actions were in complete accord with the literal terms of section 112(g) and (i)(1)(B) of the Revenue Act of 1928, yet the Supreme Court denied the taxpayer the benefits of the section, stating that—

The whole undertaking * * * was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. * * * the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

In *Higgins* v. *Smith*, 308 U.S. 473, there was a literal compliance with the terms of section 23(e) of the Revenue Act of 1932, yet the Supreme Court denied the taxpayer the benefits of the section, noting that—

The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute.

In *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, the Supreme Court observed that "[t]he incidence of taxation depends upon the substance of a transaction." In *Gilbert* v. *Commissioner*, 248 F. 2d 399 (C.A. 2, 1957), it was stated that—

statutory terms are not to be interpreted independent of their context and underlying policy. "Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed * * *." *Griffiths* v. *Helvering*, *supra*. Thus, not every plan that reorganizes is a "plan of reorganization" under the Code, not every sale is a transaction that can cause a "loss" for tax purposes, and not every advance cast in the form of a loan gives rise to an "indebtedness" which will justify a tax deduction.

By the same token not every payment of interest is within the scope of section 23(b). In *W. Stuart Emmons*, 31 T.C. 26 (1958), on appeal (C.A. 3), the petitioner purchased a fully paid-up annuity contract utilizing funds borrowed from a bank, and pledged the contract as collateral for the bank's loan. He then paid an additional sum of money to the insurance company designated as prepaid interest to the 1956 anniversary date of the policy, and received, purportedly as a loan, the "cash or loan" value of the policy as of its 1956 anniversary. He used part of the funds he received to repay the bank loan. In the following year he again made a payment to the company designated as prepaid interest, this time to the 1959 anniversary date of the policy, and received, purportedly as a loan, an amount equal to the increment in the "cash or loan" value of the policy on its 1959 anniversary date over its "cash or loan" value on its anniversary date in 1956. This Court denied petitioner's deductions of the prepaid interest, stating that—

We might well characterize petitioner's activities here as an operation having no business or annuity or borrowing purpose—a mere device which put on the form of a loan as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to borrow money (or purchase an annuity) but to create a deduction for income tax purposes.

Similarly, we may freely concede the reality and validity of the annuity contract introduced into evidence. But it was acquired solely as a "contrivance," to the end that petitioner should acquire an interest deduction. Paraphrasing once more, the entire transaction, although in terms within section 23(b), was an elaborate and devious attempt to create a deduction for tax purposes masquerading as the purchase of an annuity policy.

* * * the sole activity, its beginning and end, was the production, where none would otherwise have existed, of a deduction.

This Court made a further observation, particularly pertinent to the instant case—

If the deductions claimed are not to be allowed, there is no possibility and there could never have been a possibility that petitioner's transactions will result other than in a loss. * * * To recognize this fact is to recognize that the sole value of the series of acts undertaken lies not in any business, investment, or annuity purpose, but solely in the tax field.

* * * the transaction in question here did not represent a bona fide borrowing in substance, as opposed to form * * *

Throughout the above-mentioned cases is an underlying theme that only bona fide business transactions having a legitimate business purpose in addition to the minimization of taxes will be recognized for tax purposes, and then only if the characterization the taxpayer places on the transactions is in reality what it purports to be in form. A transaction which has no purpose other than the avoidance or reduction of taxes, will be ignored for tax purposes. With this principle in mind, we examine the facts in the case before us.

Petitioner points to the letter of February 26, 1954, from GFC and the testimony of Cushing, who signed the letter as treasurer of GFC, as showing that bonds were actually purchased and received by GFC. Petitioner produced no documentary evidence, however, clearly establishing the receipt of the bonds or the alleged re-hypothecation of such bonds to Lake View Trust Co., and the obvious personal interest of Cushing renders his testimony insufficient on this point. The entries on GFC's books relating to the Miles transaction do not reveal that bonds were physically received by GFC and then sent to Lake View Trust Co. It is inconceivable that bonds of such value would have been delivered to GFC without payment. In this connection, it is noted that GFC had no cash with which to pay for the bonds allegedly purchased, and that there is no entry on GFC's books recording a payment of cash to Livingstone & Company for the bonds.

At best the evidence before the Court is inconclusive as to whether bonds were purchased by petitioner and physically transferred to GFC, and whether an indebtedness by petitioner in favor of GFC actually arose. However, assuming but not deciding that the parties' actions effected transfers of securities and moneys and created a valid indebtedness, thereby literally complying with the terms of section 23(b), it does not follow that the prepaid interest is deductible. Since the bonds allegedly purchased by petitioner had all coupons payable prior to March 15, 1959, detached, petitioner could only profit from his purchase if the market value of the bonds substantially appreciated. The bonds were "purchased" at 86⅞, and it must have been obvious to petitioner that the bonds would have to rise to 105 before he would even recoup his "prepaid interest." It is clear that petitioner did not "purchase" the bonds with any rational hope of realizing a profit other than as a result of the interplay of various sections of the Internal Revenue Code, that is that appreciation in value of the bonds, once realized, would be taxed to petitioner at capital gain rates, and that his "prepaid interest" would be fully deductible from ordinary income, and substantially reduce his 1953 income tax. In short, petitioner had no reasonable hope of realizing a profit on his investment other than from a substantial tax deduction. The transaction was economically unfeasible without the favorable tax impact.

In the final analysis we must conclude that if petitioner did purchase the bonds and incur an indebtedness he did so but for one reason, to realize a tax deduction. When examined in this posture, the interest allegedly paid is not within the intendment of section 23(b) and is not deductible by petitioner. The entire undertaking was but an elaborate and circuitous tax deduction scheme assuming the form of a security investment and incurrence of indebtedness. Compare *Eli D. Good-*

*stein*, 30 T.C. 1178 on appeal (C.A. 1), and *George G. Lynch*, 31 T.C. 990 (decided this day), which involve transactions quite similar to the instant case.

*Decision will be entered for the respondent.*