GEORGE G. LYNCH AND MARIAN T. LYNCH, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67072.    Filed February 13, 1959.

*Richard W. Wilson, Esq.*, for the petitioners.
*John M. Doukas, Esq.*, for the respondent.

BRUCE, *Judge:* This proceeding involves a deficiency in income tax of $79,881.32 for 1953. The only issue is whether petitioner is entitled to deduct $117,677.11 as interest expense for 1953 pursuant to section 23(b), I.R.C. 1939.

FINDINGS OF FACT.

During the year in issue the principal petitioner, George G. Lynch, and his wife, Marian, resided in Forestville, Connecticut. They filed a joint income tax return for the year 1953 with the district director of internal revenue for the district of Connecticut. Petitioners reported their income on the cash basis.

In 1953 petitioner was an executive of the Bristol Machine Tool Company, Inc. He was the principal manager of sales and shop operations of the company and coowner of the company with Leslie Julian. In 1953 he received salary and dividends from Bristol totaling $134,435.32, and had other income totaling $2,240.04. Petitioner was not a dealer in United States securities, and prior to 1953 had never made any substantial purchases of United States or any other securities.

At all times pertinent hereto M. Eli Livingstone was a security dealer in Boston, Massachusetts, doing business in the form of a sole proprietorship under the name of Livingstone & Co. Livingstone developed an investment plan whereby high income taxpayers theoretically would realize substantial tax savings by means of a large interest deduction. Livingstone apparently profited from his plan by receiving commissions on sales of securities and by receiving "finders fees" from various finance companies for referring individuals to them to borrow money.

Gail Finance Corporation, hereinafter referred to as GFC, was a Massachusetts corporation allegedly doing business as a finance company in Harry N. Cushing's law offices at 70 State Street, Boston, Massachusetts. GFC was organized on October 30, 1953, with a total capital contribution of $1,000. During 1953 through 1957 GFC was not listed in Polk's Boston City Directory, Boston Yellow Pages, Boston Telephone Directory or the Telephone Address Record Book, Boston, Massachusetts.

Substantially all the money GFC "loaned" to various individuals was raised by short sales of United States and other securities. It did no advertising, never received a credit report on any of the individuals to whom it "loaned" money, never met any of the individuals to whom it "loaned" money, received substantially all of its business on reference from Livingstone, and never refused to extend credit to anyone referred to it by Livingstone. Between October 31, 1953, and October 31, 1956, although it had "loaned" millions of dollars to various individuals, GFC reported a taxable net income for the fiscal year ending October 31, 1954, totaling $1,487.73, and net losses in the following 2 years. During this period commissions, apparently "finders fees" to Livingstone, and an item called "Borrowed Bond Expense" wiped out substantially all interest income.

Commissions paid by GFC during the fiscal year ending October 31, 1954, amounted to $422,121.50, most of which was paid to Livingstone & Co.

Harry N. Cushing, an attorney, is a longtime friend and former law partner of Livingstone. At all times material hereto Cushing was president and treasurer of GFC. He was also president and/or treasurer of five similar finance companies, including Seaboard Investment Corporation, allegedly doing business in his law offices at 70 State Street, but like GFC, having no telephone or address listings. Samuel Livingstone, M. Eli Livingstone's brother, was president of two of the above-mentioned finance companies.

Petitioner and Julian received information about Livingstone's plan from Gustave Simons, their attorney. Petitioner, on the advice of Julian and others whose opinions he respected highly, entered into a series of transactions which *in form* were as follows:

On or about December 2, 1953, Livingstone & Co. loaned petitioner $80,000. The loan was unsecured and non-interest-bearing. Livingstone had never met nor previously been acquainted with petitioner. On December 3 petitioner purchased through Livingstone & Co. at 86⅞ $650,000-face-value United States Treasury 2¾ per cent bonds, due September 1961, with March 15, 1959, and subsequent coupons attached. Livingstone & Co. sold the bonds to petitioner in a short position as "principal" and did not charge petitioner a commission on the sale. The purchase price of the bonds was $564,687.50.

On December 3 petitioner borrowed $653,250 from GFC to finance his purchase of the treasury bonds. Petitioner pledged the treasury bonds as security for the loan from GFC, and executed a nonrecourse promissory note in favor of GFC. The note provided as follows:

$653,250.00

On September 15, 1958 I promise to pay to the Gail Finance Corp., a Massachusetts corporation at its principal office in Boston, Mass., (hereinafter referred to as the obligee) the sum of—

SIX HUNDRED FIFTY-THREE THOUSAND, TWO HUNDRED FIFTY AND 00/100 DOLLARS

Interest in full in the amount of $117,677.11 having been prepaid by me; subject to the following rights and conditions, having deposited with the said obligee the following securities as collateral:

$650,000 U.S. Treasury 2¾% Notes of 9/15/61—(maturing in Sept. 1961 with March 15, 1959 and subsequent coupons attached.)

The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein, and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the principal and interest due hereunder.

The undersigned shall not be called upon nor be liable to furnish additional collateral to the obligee at any time.

The undersigned may anticipate payment, in whole or in part, at any time, of the amount due hereunder, and shall receive back a pro rated portion of the collateral so held; provided nevertheless that interest at the rate of 1% shall be charged pro rated against the amount or amounts so paid by anticipation.

All payments received by the obligee directly from or indirectly for the account of the undersigned shall be applied first to payment of interest and any balance thereof applied to payment of principal due hereunder as the obligor shall elect.

The undersigned shall not in any event be personally liable to pay any of the principal indebtedness hereof or interest arising hereunder (including the penalty interest of 1% per annum for prepayment) except from the proceeds from the sale of the said collateral deposited. Application of the proceeds from the sale of the said collateral shall be made by the obligee on the due date and shall be a full accord and satisfaction of any and all claims hereunder and act as a full and complete discharge of any and all liabilities of the undersigned.

This note shall be interpreted in accordance with a letter dated Nov. 18, 1953 signed by M. Eli Livingstone and Gail Finance Corp. and the said letter shall hereby be incorporated and made a part of this note.

This note has been entered into in the City of Forestville, and shall be construed and interpreted in accordance with the laws of the State of Connecticut.

[s]   G. G. Lynch   (Seal)

This note and all of the terms and conditions hereof accepted this December 3, 1953.

GAIL FINANCE CORP.<br>[s]   Harry N. Cushing<br>*Treasurer*

On the same day petitioner prepaid to GFC the full interest on the note to maturity in the amount of $117,677.11. Petitioner wrote a letter to Livingstone & Co. dated December 3, as follows:

LIVINGSTONE & COMPANY
*10 Post Office Square*
*Boston 9, Massachusetts*
Gentlemen:
 Please deliver to Gail Finance Corp., the following
 $650,000 U.S. Treasury 2¾% due September 1961 with March 15, 1959 and subsequent coupons attached
against payment by them to you of $653,250, which is the proceeds of my loan with them.
 After reimbursing yourselves in the amount of $564,687.50, please remit the difference to me.
   Very truly yours,

[s]   George G. Lynch

GEORGE G. LYNCH
*152 Kenney Street*
*Forestville, Connecticut*

At the time GFC loaned $653,250 to petitioner it had only $1,381.65 cash on hand. GFC raised additional funds to loan petitioner by selling short to or through Livingstone & Co. the identical type and amount of bonds pledged to it by petitioner, for $564,687.50, the same price paid by petitioner.

On or about December 7, instead of paying $653,250 to Livingstone & Co. as apparently requested by petitioner, GFC sent petitioner a check for $88,562.50, an amount representing the difference between the purchase price of the bonds and its loan to petitioner. On or about December 10 petitioner repaid Livingstone & Co. the $80,000 he had borrowed.

Appropriate bookkeeping entries were made on the books of GFC and Livingstone & Co. to reflect the above outlined transactions. Since GFC owed Livingstone & Co. $564,687.50 in behalf of petitioner, and since Livingstone & Co. owed GFC a like amount due to GFC's short sale to Livingstone & Co., the liabilities canceled each other. No Treasury bonds were physically transferred between petitioner, Livingstone & Co., and GFC.

In arriving at his 1953 taxable income petitioner claimed an interest deduction in the amount of $117,677.11, representing prepaid interest on his loan from GFC. Respondent disallowed the above deduction, claiming it was not within the scope of section 23(b), I.R.C. 1939.

OPINION.

The only issue is whether petitioner, pursuant to section 23(b), I.R.C. 1939,[1] is entitled to deduct $117,677.11 as interest paid on an indebtedness in 1953.

Indebtedness has been defined as "an unconditional and legally enforcible obligation for the payment of money." *Autenreith* v. *Commissioner*, 115 F. 2d 856 (C.A. 3, 1940). Interest has been defined as "the amount which one has contracted to pay for the use of borrowed money." *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552.

Respondent disallowed petitioner's interest deduction. He contends that the transactions entered into by petitioner were not significant for tax purposes because what was done, apart from the tax motive, was not within the intendment of the statute. He further contends that the transactions should be ignored for tax purposes because they were a sham, or if not a sham, because their characterization lacked in commercial or economic reality.

Petitioner argues that his investment in bonds, incurrence of indebtedness and payment of interest were legitimate business transactions and that he embarked on this venture with the hope of realizing

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.

a profit from the bonds' appreciation in market value. He argues in the alternative that assuming his transactions lacked business purpose or commercial substance it is of no moment, for a deduction pursuant to section 23(b) is not subject to limitation on this basis.

A taxpayer has the right to mold a transaction having a legitimate business purpose in such a manner as to minimize the incidence of taxation, for no individual is obligated to pay more tax than the law demands of him. *United States* v. *Isham*, 84 U.S. 496; *Gregory* v. *Helvering*, 293 U.S. 465; *United States* v. *Cumberland Public Service Co.*, 338 U.S. 451. A commonly encountered problem, however, is that a taxpayer, seeking to avoid taxation, will clothe a transaction and make it appear to be something which in reality it is not. When the Court is confronted with this type of problem, it will ignore the form the transaction has assumed, declaring it to be a sham or lacking in economic reality, and will ascertain the tax impact based upon the substantive nature of the transaction. *Gregory* v. *Helvering, supra; Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260.

Another frequently encountered problem is that a taxpayer will embark upon a "business" transaction having no purpose other than the avoidance of taxation by creating a tax deduction. Such a transaction is clearly not within the intendment of the taxing statute and will be ignored for tax purposes. *Higgins* v. *Smith*, 308 U.S. 473; *Eli D. Goodstein*, 30 T.C. 1178, on appeal (C.A. 1), and *W. Stuart Emmons*, 31 T.C. 26 (1958) on appeal (C.A. 3). A careful scrutiny of the facts before us will reveal that this is the problem in the instant case.

Assume for the moment that the transactions herein involved were real and the parties' actions effected transfers of securities and moneys and created a valid indebtedness in the amounts purported. Petitioner, a successful businessman, entered this investment venture upon the advice of individuals whose business acumen was respected by him. Petitioner, like any other businessman, would not embark upon a business venture if there was no reasonable chance of realizing a profit therefrom. Businessmen by their nature are imbued with a desire to profit from their business enterprises.

The bonds purchased by petitioner had all coupons payable prior to March 15, 1959, detached. Therefore, petitioner could only profit from the transaction if the market value of the bonds substantially appreciated. The bonds were purchased at 86⅞, and it is obvious that the bonds would have to rise to 105 before petitioner would even recoup his prepaid interest of $117,677.11. It is clear that petitioner did not purchase the bonds as an investment with any rational hope of realizing a profit other than as a result of the interplay of various

sections of the Internal Revenue Code, that is that appreciation in value of the bonds, if ever realized, would be taxed to petitioner at capital gains rates, and that his prepaid interest would be fully deductible from ordinary income and substantially reduce his 1953 income tax. In short, petitioner had no reasonable hope of realizing a cash profit on his investment other than from a substantial tax deduction. The transaction was economically unfeasible without the favorable tax impact.

The conclusion is irresistible that petitioner purchased the bonds and incurred the indebtedness primarily to realize a tax deduction. When examined in this posture, the interest expense is not within the intendment of section 23(b) and is not deductible by petitioner. The entire undertaking was an elaborate and circuitous tax deduction scheme assuming the form of a security investment and incurrence of indebtedness. "The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Gregory* v. *Helvering, supra.*

Respondent's determination may be sustained on yet another basis, for it is obvious that the transactions herein involved were nothing but a sham. To illustrate that the transactions were but the shadow of what they were represented to be, it need only be pointed out that Livingstone, in his dealings with Lynch, did not utilize established banking and investment institutions or real securities. In the instant case the entire transaction was developed through a series of bookkeeping entries. Livingstone & Co. loaned petitioner $80,000 to initiate the "investment" transaction. This was an essential feature of the plan for petitioner would have been quite hesitant to part with $117,677.11 of his own money for even a short time under the circumstances. Petitioner proceeded to "borrow" from GFC $653,250, an amount over $650,000 in excess of what GFC had available to loan. GFC purportedly raised the money by a method which might be labeled "short sale financing." GFC "sold short" to or through Livingstone & Co. $650,000 face value of United States Treasury 2¾ per cent bonds, due September 1961, with March 15, 1959, and subsequent coupons attached for $564,687.50. As a result of this "sale" Livingstone & Co., on paper, owed GFC $564,687.50, and GFC, on paper, was obligated to deliver $650,000 face value of Treasury bonds to Livingstone & Co. On the same day petitioner utilized his "borrowed funds" to "purchase" from Livingstone & Co. the identical type and amount of Treasury bonds as Livingstone & Co. had "purchased" from GFC, and at the same price Livingstone & Co. had "purchased" from

GFC. Petitioner apparently directed GFC to "pay" Livingstone & Co. the "purchase price" of the bonds. Since petitioner had "pledged" the bonds to GFC as security for his "loan," Livingstone was obligated to deliver the bonds to GFC. On paper GFC thus owed Livingstone & Co. $564,687.50, and Livingstone & Co., on paper, was obligated to deliver $650,000 face value of Treasury bonds to GFC. GFC and Livingstone & Co. then owed each other identical amounts of money and identical amounts and types of Treasury bonds. No cash or bonds were needed in these transactions for the obligations canceled each other, and none were used.

Petitioner, utilizing the $80,000 mailed to him by Livingstone & Co. and $37,677.11 of his own funds, gave GFC a check for $117,677.11, representing "prepaid interest" for the entire term of the loan. The "purchase price" of the bonds was only $564,687.50, and GFC therefore "owed" petitioner $88,562.50, representing the balance of the $653,250 "loan" to him. GFC, having received $117,677.11 from petitioner, was then able to send petitioner the balance of the "loan." Petitioner then repaid Livingstone & Co. the $80,000 he had borrowed to initiate the transaction.

In the final analysis petitioner had $29,114.61 less than he began with, but had acquired a $117,677.11 interest deduction. Petitioner had no worry about his $653,250 "loan" from GFC because he had signed a nonrecourse note. According to the terms of the note, GFC could look only to the bonds for repayment of the "loan." Since no bonds were in existence, GFC had no security for the $653,250 "loan" to petitioner, but despite this fact GFC ended up with $29,114.61 more than it began with, for it had never distributed even one penny of the "loan" to anyone. Most of the $29,114.61 was ultimately funneled off to Livingstone & Co. as a "commission" or "finders fee." It is obvious that GFC was nothing but a puppet of Livingstone's. It is obvious that petitioner purchased no bonds from Livingstone & Co. It is obvious that GFC did not loan petitioner $653,250. It is obvious that no bonds were pledged with GFC. There was no indebtedness. There was no prepayment of interest.

The transactions in the instant case are quite similar to the Livingstone-inspired transactions in *Eli D. Goodstein, supra*. The transactions in *Goodstein*, however, are more specious than the transactions in the instant case, for Livingstone by his manipulations was able to involve such institutions as C. J. Devine & Co. and the Guaranty Trust Company, and maneuvered a transfer of securities between these institutions. In the *Goodstein* transactions Seaboard Investment Corporation was the counterpart of GFC in the transactions herein involved. See *Eli D. Goodstein* and the cases therein cited.

Petitioner presented evidence composed of a series of bookkeeping entries, letters, and a sale confirmation from Livingstone & Co. purporting to represent the acquisition by petitioner of bond coupons dated September 15, 1954, through September 15, 1958, for $50,000-face-value United States Treasury 2¾ per cent bonds due September 1961, and the sale by petitioner of $50,000-face-value Treasury bonds he allegedly purchased in 1953. These transactions allegedly occurred in 1954. Bookkeeping entries, although evidence of the transactions they purport to record, are not conclusive. *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179. As noted above, petitioner owned no bonds and had none to sell. His purported sale was nothing but an attempt to surround a series of lifeless transactions with an aura of vitality. This evidence has no substantive value herein.

*Decision will be entered for the respondent.*

*Richard W. Wilson, Esq.*, for the petitioners.
*John M. Doukas, Esq.*, for the respondent.

