PERRY A. NICHOLS AND INEZ NICHOLS, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 81752–81755. Filed January 17, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith: William C. Gaither and Elaine B. Gaither, Docket No. 81753; Walter H. Beckham and Ethel K. Beckham, Docket No. 81754; and William S. Frates and Jean Frates, Docket No. 81755.

*Cyrus A. Neuman, Esq.*, for the petitioners.
*Kenneth G. Anderson, Esq.*, for the respondent.

OPINION.

Raum, *Judge:* We have made extensive findings of fact in these consolidated cases which we think clearly reveal that the transactions

herein are in all essential respects the same as the transactions considered in the large body of precedent dealing with other Livingstone-directed dealings, *Eli D. Goodstein*, 30 T.C. 1178, affirmed 267 F. 2d 127 (C.A. 1) ; *Broome* v. *United States*, 170 F. Supp. 613 (Ct. Cl.) ; *Sonnabend* v. *Commissioner*, 267 F. 2d 319 (C.A. 1), affirming per curiam a Memorandum Opinion of this Court; *Lynch* v. *Commissioner*, 273 F. 2d 867 (C.A. 2), affirming 31 T.C. 990 and *Leslie Julian*, 31 T.C. 998; *Egbert J. Miles*, 31 T.C. 1001; *Becker* v. *Commissioner*, 277 F. 2d 146 (C.A. 2), affirming a Memorandum Opinion of this Court; *Morris R. DeWoskin*, 35 T.C. 356, appeal dismissed (C.A. 7) ; and with analogous "tax-saving" schemes, cf. *Knetsch* v. *United States*, 364 U.S. 361; *United States* v. *Roderick*, 290 F. 2d 823 (C.A. 5) ; *MacRae* v. *Commissioner*, 294 F. 2d 56 (C.A. 9), affirming in part and remanding in part 34 T.C. 20, certiorari denied 368 U.S. 955; *Kaye* v. *Commissioner*, 287 F. 2d 40 (C.A. 9), affirming per curiam 33 T.C. 511; *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26, certiorari denied 364 U.S. 908; *William R. Lovett*, 37 T.C. 317; *Empire Press, Inc.*, 35 T.C. 136. The holding in each of these prior cases that the transactions therein considered were lacking in substance, were shams which can have no effect for tax purposes, is controlling here. In the instant case, as was true in the above-cited cases in which M. Eli Livingstone was also involved, there was no actual purchase of Government securities,[3] petitioners' purported loans from Corporate Finance, a member of what has been aptly described as "the Livingstone bevy of nominal lending agencies," [4] were wholly lacking in substance since Corporate Finance had no funds to lend, and thus petitioners could not and did not make payments of "interest" on "indebtedness" to Corporate Finance in 1955 within the meaning of section 163 of the 1954 Code. We think the Commissioner's disallowance of the claimed interest deductions was proper.

Petitioners contend that there is a fundamental difference between the present facts and the transactions considered in the earlier cases.

---

[3] Although the parties stipulated that the Treasury notes purportedly here involved were transferred from the New York offices of the bond dealers, Salomon Bros. and Hutzler, to the account of Livingstone at the Chemical Corn Exchange Bank and back again to Salomon Bros. and Hutzler all on the same day, it is apparent from testimony elicited at the trial that the matching, simultaneous delivery and receipt instructions to the bond dealers and the bank canceled each other so that the Treasury notes in fact never left the bond dealers' offices. Counsel for petitioners and the Commissioner indicated to the Court that the stipulation had been based on incomplete information obtained before trial from the same witness who testified at the trial. In these unusual circumstances the Court permitted the testimony to remain in the record at variance with the stipulation. Our findings of fact have taken such testimony into consideration. Of course, it makes little difference whether or not the Treasury notes were physically transferred to Livingstone's account for a few minutes or hours, as was true in the *Goodstein* case ; in either case no Treasury notes or Government securities of any kind were in fact purchased by petitioners.

[4] *Broome* v. *United States*, 170 F. Supp. 613, 615.

They argue that the taxpayers in the cited precedents were all found to have been parties to the sham dealings therein, either directly through knowledge or indirectly through acquiescence or indifference, while in the instant transaction there is evidence that Livingstone assured petitioners that the Treasury notes would actually be purchased and held as collateral, that there would be no "short sale" of the notes, so that petitioners in no sense can be considered parties to Livingstone's sham. However, we are not impressed by this alleged basis of distinction.

Even if we accept as true the proposition that petitioners were fooled by Livingstone to the extent indicated, the contested deductions cannot stand. No matter what petitioners' intent may have been upon entering the transaction, the transaction itself remains a sham that cannot give rise to valid interest deductions. What was said by the Court of Appeals for the Second Circuit in *Lynch* v. *Commissioner, supra* at 872, in answer to a contention by the petitioners therein that they, too, were innocent of "the round-robin nature" of Livingstone's dealings, is especially pertinent here.

Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers.

Cf. *MacRae* v. *Commissioner, supra* at 59. The "objective realities" here were that petitioners purchased no Treasury notes, borrowed no funds from Corporate Finance, and paid no true interest on indebtedness. Therefore, regardless of what petitioners may have intended or believed or expected, there can be no interest deductions under the statute. The "good faith" of petitioners is irrelevant. Cf. *United States* v. *General Geophysical Co.,* 296 F. 2d 86 (C.A. 5), denying rehearing in 296 F. 2d 90, reversing 175 F. Supp. 208 (S.D. Tex.).

In addition, we think the record herein fails to support petitioners' premise that they were totally innocent of Livingstone's actual doings. Petitioners' own testimony reveals that Livingstone's program was presented to them as a tax-saving scheme which they were informed from the outset was very close to a transaction that the Internal Revenue Service had decided in a published ruling (Rev. Rul. 54–94, 1954–1 C.B. 53) would not support an allowable interest deduction. While the record indicates that petitioners and their tax adviser Hemmings were assured by Livingstone that his program would differ from the ruling's transaction because it would involve real Government securities which would not be sold "short" by the lender, it is apparent that petitioners—all experienced lawyers—made no independent investigation of the details of the transaction before purportedly investing $6 million of their funds. Not only did they not seek any

assurances from Corporate Finance, which Livingstone theoretically could in no way bind by his assurances, but each petitioner proceeded to sign supposed promissory notes to Corporate Finance which gave this so-called lending institution "the right to hypothecate and use" the securities, a right upon which Cushing relied to justify the alleged "short sale." Cf. *Eli D. Goodstein, supra* at 1188. With this background, added to the undisputed facts that Livingstone charged petitioners no commissions for either the "purchase" or "sale" of $6-million-face-amount Treasury notes nor for the valuable option to sell the same notes back to him at a profit, that he supposedly lent petitioners $195,000 for 1 year without interest after having met petitioners for the first time only a few days earlier, that he agreed to defend at his own expense any resulting tax lawsuit and reimburse petitioners for the payments they had made "in the form of interest" to Corporate Finance if their deductions were disallowed, "it would strain credulity to the breaking point to suppose that taxpayers had no inkling that something highly unusual was going on." *Lynch* v. *Commissioner, supra* at 872; cf. *MacRae* v. *Commissioner, supra* at 59; *Eli D. Goodstein, supra* at 1188. When the entire transaction is viewed in perspective, it appears that any blind acceptance by petitioners of Livingstone's so-called assurances was rather an effort to isolate themselves from the realities of the situation, whatever they might be, than anything like innocent trust or genuine reliance. So long as Livingstone "told" them it would be done properly, petitioners evidently did not care how he actually accomplished the end result of securing for them the desired income tax deductions. In sum, assuming that petitioners had no actual knowledge of Livingstone's true maneuvers, we have no doubt on this record that they had ample reason to know that the transaction was not what it purported to be. In such circumstances, petitioners must be considered to be at least indifferent, if not outright willing participants in Livingstone's sham.

Since the entire transaction was lacking in substance and no real borrowing took place, petitioners' separate contention that their notes to Corporate Finance were valid indebtednesses under Florida law because signed under seal can have no effect. Cf. *United States* v. *General Geophysical Co., supra.* Moreover, the transactions before us were a sham, and it is obvious that a sham remains a sham whether or not under seal.

Because we have sustained the Commissioner's disallowance of the claimed interest deductions, we do not pass upon his alternative position that petitioners realized income by receipt of advances from Livingstone in 1955.

*Decisions will be entered for the respondent.*