Samuel Bornstein and Lena Bornstein v. Commissioner.
Bornstein v. Commissioner
Docket No. 91038.
United States Tax Court
T.C. Memo 1963-291; 1963 Tax Ct. Memo LEXIS 55; 22 T.C.M. (CCH) 1489; T.C.M. (RIA) 63291; October 24, 1963
*55 Held, that the principal petitioner is not entitled to a deduction for "prepaid interest" paid to a bank in connection with a tax reduction scheme conceived and engineered by M. Eli Livingstone, involving the purported purchase of United States Treasury Notes with allegedly "borrowed" funds. There was no commercial or economic reality to the transaction, and no bona fide indebtedness between the petitioner and the bank. John M. Doukas, for the petitioners. Robert B. Dugan, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency in the income taxes of the petitioners for the taxable calendar year 1958, in the amount of $18,318.38. The only issue for decision *56 is whether the husband-petitioner is entitled to a deduction under section 163(a) of the 1954 Code, of $34,143.56, for an amount which he paid to a Chicago bank and which he claims represents interest on indebtedness. Findings of Fact Petitioners Samuel and Lena Bornstein are husband and wife, residing in Brookline, Massachusetts. They filed a joint Federal income tax return for the calendar year 1958 with the district director of internal revenue at Boston. Lena Bornstein is a party in the present case only because she joined in the filing of the joint return. The term "petitioner," in the singular, as used herein will have reference to Samuel Bornstein. Petitioner was, during the taxable year and for many years prior thereto, an executive officer of a corporation known as the North American Packing Corporation, which was engaged in a business of processing and distributing meat and canned meat products, with its principal office in Boston. For a number of years, North American Packing had retained the services of a Boston accounting firm, Coven and Suttenberg, one of the partners in which was a certified public accountant named Lawrence Suttenberg. Suttenberg's firm also *57 represented a Boston brokerage house, Livingstone & Company, the owners of which were M. Eli Livingstone and his brother, Samuel. Suttenberg had himself participated in, and had recommended to a number of his firm's clients that they participate in, a tax reduction plan designed by the Livingstones, which had as its central feature an alleged purchase of United States Government bonds, using allegedly borrowed funds on which interest would be prepaid to maturity at the time the funds were borrowed, with the claimed benefits to participants therein of income tax deductions for the prepaid interest and a modest capital gain on disposition of the bonds at maturity. Some time during October 1958, Suttenberg approached petitioner, and related in broad outline the Livingstone plan, and recommended that petitioner participate therein. One or two additional conferences were held between petitioner and Suttenberg, and at the last of these conferences petitioner indicated his willingness to participate in the plan by "purchasing" $400,000 face amount of United States Treasury Notes, at a price below par or face value, with funds "borrowed" from a bank. Suttenberg indicated to petitioner that *58 the Livingstones would arrange for a bank to provide the necessary "borrowed" funds, and that they would also draw up all of the necessary instruments and correspondence required to effectuate the plan. Thereafter, on or about October 28, 1958, petitioner entered into a transaction which, in form, involved the steps set forth in the following numbered paragraphs. 1. On October 28, Suttenberg brought to petitioner's office a prepared set of letters and other instruments which petitioner, who had never seen the Livingstones and who had not met or had any dealings with the parties to whom the instruments ran, was to sign in implementation of his participation in the program. All of these had been prepared by M. Eli Livingstone. Among the Livingstone-prepared instruments were two [1] identical documents purporting to be promissory notes, each of which was dated November 5, 1958, was in the principal amount of $182,500, was payable to the order of the South Side Bank & Trust Co. of Chicago, bore interest at the rate of 3.8 percent per annum, and was due and payable on April 1, 1963. Each of said notes, after calling for the deposit of $200,000 face amount of United States Treasury 1 1/2 Percent *59 Notes due Paril 1, 1963 (hereinafter called Treasury 1 1/2's), as collateral security, provided in part as follows: Total interest charge is $30,571.78, of which $17,071.78 is paid herewith, and the balance of interest is to be paid by application of coupons on the collateral deposited, which are hereby assigned for this purpose. This is a term loan, and payment may not be accelerated. The undersigned shall not be called upon to furnish additional collateral during the term of this loan. The rate of interest agreed upon is predicated upon the express agreement that the loan will not be prepaid, and that the full dollar amount of interest to maturity will be prepaid, and there shall be no obligation to return the collateral until the maturity date of this note. Petitioner signed the notes and at the same time, he signed two identical letters addressed to the South Side bank, which letters likewise had been prepared by Livingstone, wherein he (petitioner) authorized the sale or assignment of the justmentioned promissory notes and the transfer to the bank's vendee or assignee of the Treasury 1 1/2's mentioned as the collateral security therefor. *60 2. Petitioner drew a check dated October 31, 1958, on his personal account in a Boston bank, payable to the order of the South Side bank, in the amount of $34,143.56, purportedly as a prepayment to maturity (April 1, 1963) of interest (i.e., actually that portion of the interest which would not be covered by the coupons attached to the notes) in the amount of $17,071.78 on each of the above "promissory notes." Petitioner turned over the notes, the letters and the check to Suttenberg who either mailed the same to the South Side bank or took them to the offices of Livingstone & Company, from which place they were mailed to the said bank. 3. Also, on October 28, 1958, M. Eli Livingstone placed an order in petitioner's name with the Boston office of C. F. Childs and Company, a New York and Boston brokerage house specializing in the sale of Government securities, for petitioner to purchase two blocks of Treasury 1 1/2's, due April 1, 1963, each block of such notes to have a par or face value of $200,000. Treasury 1 1/2's were then selling at 91-8/32 (so that each block of $200,000 cost $182,500) plus accrued interest ($288.46 for each block of notes). Livingstone instructed the Childs *61 company to deliver said two blocks of notes to the Hanover Bank in New York City on November 5, 1958, for the account of the South Side bank of Chicago. In the course of the same telephone conversation in which Livingstone placed the order for petitioner to purchase $400,000 face amount of Treasury 1 1/2's, he also placed a short sale order with the Childs company, for the Corporate Finance Corporation (more fully described herein-below) to sell to Childs two $200,000-blocks of Treasury 1 1/2's, with delivery likewise to be made at the Hanover Bank on November 5, 1958. The selling price of these notes was 91-6/32 plus accrued interest ($182,375, plus interest of $288.46, on each $200,000-block of notes). 4. Still on October 28, 1958, petitioner signed two more sets of identical letters in the Livingstone-prepared package: One set to the Childs company's New York office instructing it to deliver on November 5 to his account at the South Side bank in Chicago, $400,000 face value Treasury 1 1/2's, against payment by said bank of $365,000; and the second set to the South Side bank to receive from the Childs company $400,000 face value Treasury 1 1/2's, against payment to that company *62 of $365,000. All of these letters bore the date of November 5, 1958, although they were signed by petitioner on October 28, 1958. These letters, together with the above-described notes, check, and other letters were turned over by petitioner to the accountant Suttenberg, who either himself mailed them to the appropriate parties, or took them back to Livingstone & Company's office, whence they were mailed. 5. On November 5, 1958, the South Side bank (having received the letters, notes and check from petitioner, whom no official at the bank had ever seen at that time) opened a loan account in the name of the petitioner; and on the same date it drew two cashier's checks payable to the order of the petitioner in the amount of $182,500 each, being the proceeds of the above-mentioned "loans" evidenced by the two "promissory notes" above mentioned. These checks were never sent to the petitioner; rather the bank stamped an endorsement on the reverse side of each, which stated that they were to be credited to the loan account of the petitioner. 6. On the very same date of November 5, 1958, the South Side bank purported to sell petitioner's promissory notes to the Corporate Finance Corporation *63 (more particularly described hereinbelow), and to assign to said corporation the collateral security therefor ($400,000 face value, Treasury 1 1/2's). 7. By letter dated November 3, 1958, the South Side bank advised Hanover Bank to receive on November 5, 1958, from the Childs company, Treasury 1 1/2's, in the face amount of $400,000 (these being the notes for which Livingstone had entered a "purchase" order in petitioner's name on October 28, as above mentioned); and after charging the South Side bank's account with the Hanover Bank, the latter bank was ordered to deliver the same notes to the Childs company on the same date for the account of Corporate Finance. (This step would have the effect of satisfying Corporate Finance's obligation to deliver notes to the Childs company, pursuant to Livingstone's above-mentioned October 28 short sale to the Childs company of $400,000 face amount of Treasury 1 1/2's, in the name of Corporate Finance.) 8. By two identical letters, prepared by Livingstone and dated November 5, 1958, Corporate Finance directed the South Side bank to deliver the Treasury 1 1/2's, which the bank was "holding" as "collateral," to the Childs company, at the Hanover *64 Bank in New York, against payment to the South Side bank of $182,500 as to each block. The proceeds thus "realized," by the South Side bank were to be applied by it in satisfaction of the price of the notes which Corporate Finance was "purchasing" from the South Side bank. 9. On November 12, 1958, the South Side bank forwarded to Corporate Finance, petitioner's "promissory notes" along with an accounting for the $34,143.56 of "prepaid interest." [2]South Side bank retained $1,404.12 of the last-mentioned sum as "interest, service charges and reimbursement of attendant expense of these transactions"; and it deposited the balance of $32,739.44 to the account of Corporate Finance. This last-mentioned account had been opened on Corporate Finance's behalf by Livingstone. *65 10. The "purchase" of petitioner's "promissory notes" from the South Side bank was recorded on the books of Corporate Finance by entries showing a debit in the amount of $365,000 (2 X $182,500) to an asset account "Notes Receivable-Client" and a credit to an accounts payable liability account to the Childs company in the amount of $1,345,937.50, which latter amount represented the total of five notes, including the two of petitioner's acquired by Corporate Finance on November 5, 1958. The foregoing credit entry was made, because the collateral security (Treasury 1 1/2's) was to be delivered to Corporate Finance's account with the Childs company on November 5, 1958. 11. The above-mentioned October 28, 1958, "short sale" of the $400,000 face value Treasury 1 1/2's by Corporate Finance (handled as found above, by Livingstone) was recorded in the sales journal of the corporation by an entry dated October 28, 1958. Said notes were to be delivered to the Childs company on November 5, 1958; and the delivery was to be accomplished by the South Side bank's delivery of the Treasury 1 1/2's (which it purportedly held as collateral to secure petitioner's "promissory notes") to the Childs company, *66 for the account of Corporate Finance. Paragraph numbered 7 above of these findings, reveal that the South Side bank had requested the Hanover Bank to "receive" and then immediately deliver for the account of Corporate Finance the $400,000 Treasury 1 1/2's. The Hanover Bank duly charged the South Side bank's account $365,000 for the said Treasury 1 1/2's; and then immediately made a second entry crediting the account in the same amount (thus clearing it), and debiting (i.e., creating a receivable) Corporate Finance's account. These Treasury 1 1/2's furnished the means of satisfying Corporate Finance's obligation to deliver $400,000 Treasury 1 1/2's to the Childs company which had been short sold to that company on October 28, by Livingstone, acting for and in the name of Corporate Finance. Corporate Finance Corporation was organized in 1956 under the laws of the Commonwealth of Massachusetts; and as of December 31, 1956, it had 200 shares of no par value common stock outstanding, with a stated aggregate value of $1,000. The only asset which it had at that date was an account receivable due from shareholders, in the amount of $1,000, representing their then unpaid subscriptions for *67 its capital stock. No other capital was at any time invested in the corporation. As of December 31, 1957, its balance sheet showed the following assets, liabilities, and stockholders' equity: Assets
Cash in bank
$ 196,369.91
Accounts receivable - Customers
1,423,744.98
Notes receivable - Customers
47,479,833.70
Prepaid items
60.84
Total Assets
$49,100,009.43
Liabilities
Accounts payable
$ 385,599.39
Notes & acceptances payable
13,000.00
Accrued taxes
7,623.25
Bonds borrowed
46,732,805.96
Deferred credits - Interest
1,948,134.07
Total Liabilities
$49,087,162.67
Stockholders' Equity
Capital stock
$ 1,000.00
Surplus
11,846.76
12,846.76
Total Liabilities and Stock-
holders' Equity
$49,100,009.43
Corporate Finance Corporation owned no securities and no collateral of its own with which to obtain loans. It "financed" the purchase of petitioner's "promissory notes" from the South Side bank by "selling short" to the Childs company, Treasury 1 1/2's equal in amount and denomination to the Treasury 1 1/2's ordered for petitioner by Livingstone - all as above described. Corporate Finance was affiliated with Livingstone *68 & Company, which latter company directed clients to Corporate Finance. Most of its cash receipts were disbursed to Livingstone & Company by Corporate Finance. Corporate Finance operated out of the law offices maintained by its president and treasurer, Harry N. Cushing. It had one employee, other than Cushing; it was not listed in the Boston telephone directory; and it did no advertising. Between 1951 and 1958, Cushing was president and treasurer of six other corporations and treasurer of a seventh corporation, each of which corporations was, like Corporate Finance, operated out of his law office and without any tangible assets. Petitioner, on his 1958 return reported adjusted gross income of $69,952.78. Among the itemized deductions on page 2 thereof which were utilized in arriving at taxable income, was one for "interest" paid to the South Side bank of $34,143.56. Respondent, on audit of petitioner's 1958 return, disallowed said interest deduction; and in his statutory notice of deficiency, he explained his action as follows: It has been determined that the claimed deduction on your return for the taxable year ended December 31, 1958 in the amount of $34,143.56 for alleged *69 interest paid to the South Side National Bank, Chicago, Illinois does not constitute an allowable deduction under section 163 of the Internal Revenue Code of 1954
Ultimate Findings of Fact The purported purchase of United States Treasury Notes and borrowing of funds by petitioner to finance such purchase was a sham transaction without commercial substance. There was no genuine and bona fide indebtedness existing between petitioner and the South Side Bank & Trust Company of Chicago, Illinois. Opinion This case presents the question of the deductibility of "interest" paid on allegedly "borrowed" funds in a transaction concocted and engineered by M. Eli Livingstone, a Boston broker. This and other courts have held that interest deductions claimed by Livingstone's clients were not allowable, on the grounds that the transactions lacked commercial and economic reality, and that no genuine indebtedness existed between the taxpayers and the purported lenders. See Eli D. Goodstein, 30 T.C. 1178, affd. (C.A. 1) 267 F. 2d 127; Broome v. United States, (Ct. Cls.) 170 F. Supp. 613; Sonnabend v. Commissioner, (C.A. 1) 267 F. 2d 319, *70 affirming a Memorandum Opinion of this Court; Lynch v. Commissioner, (C.A. 2) 273 F. 2d 867, affirming 31 T.C. 990; Leslie Julian, 31 T.C. 998; Egbert J. Miles, 31 T.C. 1001; Becker v. Commissioner, (C.A. 2) 277 F. 2d 146, affirming a Memorandum Opinion of this Court; Morris R. De Woskin, 35 T.C. 356; Perry A. Nichols, 37 T.C. 772, affd. (C.A. 5) 314 F. 2d 337; and Rubin v. United States, (C.A. 7) 304 F. 2d 766. We think that the decisions in those cases compel a denial of the claimed interest deduction in the instant case. Of persuasive authority also is the recent decision of the Supreme Court in Knetsch v. United States, 364 U.S. 361, wherein interest deductions were denied in respect of amounts paid to an insurance company by the taxpayer as "interest" on so-called "loans" made to purchase single-premium annuity savings bonds. The instant case does present one slight variation from the pattern in the above Livingstone cases. In each of those cases the "lender" was one of the several corporations formed by Harry Cushing, one of which is Corporate Finance *71 Corporation involved in the case at bar. Here, the ostensible "lender" was the South Side bank, but it is plain that the bank was merely a conduit in routing the "notes" and related "interest payments" to Cushing's Corporate Finance Corporation, and that said bank did not lend petitioner any money. A similar situation was present in A. A. Helwig, 37 T.C. 1046, a Knetsch- type case where a bank had been interposed between the taxpayer and the insurance company. We there said, respecting the presence of the bank in the scheme: It is clear * * * that at most the bank lent petitioner the use of its name, not its funds, and that in reality petitioner neither borrowed money from nor paid interest to either the bank or the All Service Life Insurance Corporation. * * *
The bank's participation herein was merely commercial window dressing * * * In substance, the bank made no loans to customers of All Service such as petitioner and risked none of its money. For a small service charge it permitted the use of its name in such transactions and served as a conduit of the so-called interest payments to its depositor, All Service. In these circumstances, the $7,341.20 paid by petitioner *72 to the bank * * * does not qualify as "interest paid * * * on indebtedness" under section 163
* * *
Those words lescribe the South Side bank's position in the instant case to a tee. The presence of the South Side bank does not furnish a legally significant difference between this and the other Livingstone cases. And, what we said in Perry A. Nichols, supra, effectively disposes of petitioner's contention that this case is distinguishable from the other Livingstone cases because he was not a party to the sham dealings: Even if we accept as true the proposition that petitioners were fooled by Livingstone to the extent indicated, the contested deductions cannot stand. No matter what petitioners' intent may have been upon entering the transaction, the transaction itself remains a sham that cannot give rise to valid interest deductions. What was said by the Court of Appeals for the Second Circuit in Lynch v. Commissioner, supra [273 F. 2d 867] at 872, in answer to a contention by the petitioners therein that they, too, were innocent of "the roundrobin nature" of Livingstone's dealings, is especially pertinent here. Save in those instances where *73 the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers. Cf. MacRae v. Commissioner, supra [294 F. 2d 56] at 59. The "objective realities" here were that petitioners purchased no Treasury notes, borrowed no funds from Corporate Finance, and paid no true interest on indebtedness. Therefore, regardless of what petitioners may have intended or believed or expected, there can be no interest deductions under the statute. The "good faith" of petitioners is irrelevant. Cf. 296 F. 2d 86 (C.A. 5), denying rehearing in 296 F. 2d 90, reversing 175 F. Supp. 208 (S.D.Tex.). We decide the case for the respondent. Decision will be entered for the respondent. Footnotes
1. As will shortly appear, petitioner's purported "loan" in this case was $365,000, an amount which exceeded the state-imposed limits on loans which could be made at one time to any one borrower by the Livingstone-selected bank, the South Side Bank & Trust Co. of Chicago. The bank accordingly separated the "loan" into two smaller "loans" of $182,500 each, in order to preclude (as it believed) violation of the Illinois loan limits. Hence it was necessary that there be two of most of the letters, documents, and instruments involved in carrying out the plan - one for each purported $182,500 "loan."↩
2. This step in the transaction had the effect of reducing the petitioner's "loan account" balance to zero, as is shown in the following transcript of the entries in said account (all entries being dated November 5, 1958): Debits
Credits
Balance
$182,500.00 (c)
$182,500.00 (a)
702.06 (e)
16,369.72 (d)
182,500.00 (c)
182,500.00 (a)
702.06 (e)
16,369.72 (d)
34,143.56 (b)
00
(a) Proceeds of petitioner's "loan" from South Side bank. (b) Petitioner's check for "interest". (c) Purported distribution on behalf of petitioner. (d) Unearned "interest" distributed to Corporate Finance Corporation. (e) South Side bank's charges for handling the purported loan transactions involving the petitioner.↩