*Decision will be entered under Rule 50.*

JOSEPH H. BRIDGES AND LILLIER J. BRIDGES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86524. Filed March 27, 1963.

*Richard E. Thigpen, Esq.,* and *Robert L. Hines, Esq.,* for the petitioners.

*Wallace E. Whitmore, Esq.,* and *Paul J. Weiss, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the taxable years 1956 and 1957 in the respective amounts of $12,983.87 and $31,628.18.

The only issue for decision is whether petitioners are entitled to deductions for interest in 1956 and 1957 in the respective amounts of $19,687.50 and $48,281.25.

---

FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Charlotte, N.C, during the years 1956 and 1957. They filed joint Federal income tax returns for the years 1956 and 1957 with the district director of internal revenue, Greensboro, N.C., on a calendar year basis and cash method of reporting. Hereafter, petitioner Joseph H. Bridges will be referred to as petitioner.

Petitioner was engaged in the furniture business in North and South Carolina and had substantial investments in other businesses, such as a bank and a finance company. He was a director of the Wachovia Bank & Trust Co. and of Home Finance Group, Inc. He received and reported substantial amounts of ordinary income during the period under review.

Garvin, Bantel & Co. (hereafter sometimes called broker), members of the New York and American stock exchanges with offices in New York City, is engaged in the business of buying and selling securities for its clients, and also engages in the business of arranging collateral loans for 200 to 300 commercial banks throughout the United States. In this latter function, the firm arranges loans for banks at a rate of interest greater than that available to the banks locally. In this capacity, the firm is commonly known as a "money broker," or a "note broker." In transactions of the latter sort, after the broker is contacted by, or contacts, a potential borrower, the broker gets in touch with one of the 200 to 300 banks with which it commonly deals, discusses the details of the proposed loan, and obtains the verbal commitment of the bank for the loan on prescribed terms. The broker keeps on hand loan forms of most of the banks with which it deals. These forms are the documents which a particular bank would require to be executed by the borrower in connection with a loan made by it. The broker prepares these instruments for the signature of the borrower and, after they are executed, forwards them, together with the borrower's check for prepaid interest if such is the case, to the lender-bank. Generally, the lender-bank, which is not in the New York City area, will direct that the collateral securing the loan be held by a New York correspondent bank of the lender-bank.

When Garvin, Bantel & Co. acts as a "money broker" or a "note broker," it receives its compensation from the lender-bank, as a "commission," or "rebate of commission," or "finder's fee," which is generally 0.25 percent of the loan but sometimes may be a definite sum set by prearrangement between the lender-bank and the broker. No compensation is received by the broker directly from the borrower, who is told, if he asks, that any fee to be paid the broker will come from the lender-bank.

*First Transaction.*

On September 19, 1956, the broker sold to petitioner $500,000 of U.S. Treasury 1⅝-percent notes due May 15, 1957, with interest coupons detached, for $486,875. The confirmation statement recited that the settlement date was September 24, 1956, that the price was 97⅜ flat, that the sale was made by the broker as principal and for the broker's own account, and that delivery of the Treasury notes was to be made by Marine Midland Trust Co. (hereafter called Marine). Published bid and asked prices for U.S. Treasury 1⅝-percent notes, without coupons, due May 15, 1957, were:

| Date of quotation | Bid | Asked |
|---|---|---|
| Sept. 19, 1956 | 98³⁰⁄₃₂ | 99 |
| Sept. 21, 1956 | 99 | 99²⁄₃₂ |

The broker arranged for the First National Bank of Baltimore, Md. (hereafter sometimes called the Baltimore bank), to loan petitioner $500,000. This loan was evidenced by a promissory note dated September 24, 1956, and signed by petitioner as maker. There was no endorser. The words and figures "$500,000 and $19,687.50 interest" were filled in a blank space at the top of the note. The note recited that "On May 15, 1957," petitioner promised to pay the Baltimore bank $500,000, and that petitioner had deposited with the bank as collateral security for payment of the note $500,000 of U.S. Treasury 1⅝-percent notes due May 15, 1957, without coupons attached. It also recited that the borrower agreed to give additional security if the lender so demanded, and that, on nonpayment, the lender would have broad powers to sell, collect, or dispose of the collateral and that the borrower would be liable for any balance due on the note after application of the proceeds from sale of the collateral.

By check dated September 21, 1956, petitioner paid the Baltimore bank $19,687.50, the amount of interest specified on his note of September 24, 1956.

On May 15, 1957, the Baltimore bank redeemed the U.S. Treasury notes at maturity for $500,000 and extinguished petitioner's liability on the note, which it canceled and returned to him on May 17, 1957, with a notice of payment acknowledging receipt of remittance in payment of the note due May 15, 1957.

The records of the broker reflect the sale to petitioner of the $500,000 Treasury notes at 97⅜ flat for $486,875; and show that delivery was to be made by Marine to the Chase Manhattan Bank (hereafter called Chase) as custodian, and that the notes were to be collateral for petitioner's loan from the Baltimore bank in the amount of $500,000, interest on which was to be $19,687.50. Under date of May 17, 1957, the Baltimore bank notified the broker that the amount of $5,529.51

was being credited to its account. The credit was explained as follows:

Commission on a/c J. Herbert Bridges due 5/15/57. 233 days (9/24/56–5/15/57) on $500,000.00 at your predetermined rate.

The loan, the sale of the Treasury notes to petitioner, the use of the notes as collateral, and the redemption of the notes were accomplished by the following steps: Broker prepared the note in the principal amount of $500,000 and interest of $19,687.50 for petitioner's signature and sent it to petitioner with a printed form which broker had partially completed. This form was directed to the Baltimore bank and, after it had been completed by broker by typewritten entries, and by petitioner in longhand, it read as follows:

Borrower: J. Herbert Bridges [1]
Collateral:
500M U.S. Treas. 1⅝% notes due 5/15/57 without coupons [1]
DELIVERY BY: Marine Midland Trust Co.
 TO: Chase Manhattan Bank
 40 Wall St., NYC [1]
Kindly receive collateral against payment as shown above.
 Very truly yours,

 (S) *J. Herbert Bridges*
 J. Herbert Bridges
 P.O. Box 10398, Charlotte, No. Carolina [1]

DELIVERY DATE

---

☑ [2] Name of Your Bank Wachovia Bank and Trust Co.
☐ Charlotte, N.C. [3]

IMPORTANT: Attached papers MUST be returned immediately to insure completion of loan. For any information pertaining to this loan, kindly contact your own broker.
 Thank you.
 Garvin, Bantel & Co., N.Y.C.
 Note Brokers

George K. Garvin (hereafter called Garvin), on behalf of the broker, sent the prepared papers and note to petitioner with a transmittal letter dated September 19, 1956. Garvin stated that broker was that day selling petitioner $500,000 of U.S. Treasury notes at 97⅜ in "accordance with your telephoned instructions." Garvin added:

Delivery has been scheduled for Monday, September 24, and it is necessary that the note and letter be signed and returned to us by that date. I will expect your interest check (drawn to the order of the bank) in the amount of $19,687.50, and in turn our check, representing the difference of $13,125. between the purchase price and the loan, will be mailed to you on Monday.

---

[1] Typewritten.
[2] Other printed blocks for information were not checked and are omitted.
[3] In petitioner's handwriting.

On September 24, 1956, Garvin again wrote petitioner sending back the form letter of instruction which petitioner had failed to sign, but also sending the firm's check to petitioner in the amount of $13,125, since delivery of the U.S. Treasury notes had occurred that day. Garvin added:

We trust this transaction will prove entirely satisfactory to you and if we can be of further service to you, or to your friends who may have similar problems, we would be delighted to have you call on us at any time.

Petitioner considered the transaction closed as far as the broker was concerned, and if he gave any consideration to the above paragraph from Garvin's letter of September 24, 1956, he took it to be simply a courteous close to a business letter.

The form set out in full above, known as a letter of instruction, is the usual one used by broker when it has arranged a loan. The completed form and the note signed by petitioner were returned to broker which forwarded them to the Baltimore bank with a notice of the loan and transfer of the collateral, called "anticipated delivery." On September 24, 1956, the Baltimore bank by telegram directed Chase to charge its account and pay $500,000 to Marine against delivery of $500,000 U.S. Treasury 1⅝-percent notes without coupons and place the notes in safekeeping lot No. 2024, account of J. Herbert Bridges, and bill broker for services. Chase notified the Baltimore bank that these steps had been taken, that its account had been debited in the amount of $500,000, and that the notes, identified by number and denomination, had been received and were being held in lot No. 2024 as directed. On May 15, 1957, Chase advised the Baltimore bank that there was credited to the account of the Baltimore bank the amount of $500,000, representing the proceeds of the notes which had been held in lot No. 2024.

On its records the Baltimore bank established loan cards reflecting the loan. The details of the loan were set forth on these records together with notations that the loan was for 233 days; that the rate of interest would be 4⅜ percent net; that the bank would receive interest net in the amount of $14,157.99; that a commission in the amount of $5,529.51 was payable to Garvin, Bantel & Co.; and that the Treasury notes, which had a market value of 99 for a total of $495,000, were to be held as collateral by Chase. There was also noted the receipt of a check for $19,687.50.

Petitioner had no contact with the Baltimore bank with respect to the loan, except as indicated above. The broker arranged the entire transaction. Petitioner had no agreements with either the bank or the broker other than those reflected in the documents referred to above. The Baltimore bank did not refund any interest to petitioner in connection with the above transaction.

On their return for 1956, petitioners reported adjusted gross income of $95,582.95 and claimed a deduction for interest paid the Baltimore bank in the amount of $19,687.50. On their return for 1957, petitioners reported a long-term capital loss in the amount of $8,875.48 from the sale, on May 14, 1957, of corporate stock purchased August 10, 1955, and they reported long-term capital gain in the amount of $13,125 from the sale, on May 15, 1957, of the U.S. Treasury notes mentioned above. Net long-term capital gain was reported to be $4,249.52 and they reported no short-term capital loss. They computed tax by using the alternative tax.

### Second Transaction.

On June 21, 1957, the broker sold to petitioner $500,000 U.S. Treasury 2¼-percent bonds, due June 15, 1962–59, for $463,557.89,[4] and notified him of the sale, for which the settlement date was June 24, 1957. The confirmation recited that the sale was made by broker as principal and for the firm's own account at a price of 92²¹/₃₂. Published bid and asked prices for U.S. Treasury 2¼-percent bonds due June 15, 1962–59, were:

| Date of quotation | Bid | Asked |
|---|---|---|
| June 21, 1957 | 92¹⁸/₃₂ | 92²²/₃₂ |
| June 24, 1957 | 92²⁸/₃₂ | 93 |
| Jan. 24, 1958 | 97³⁰/₃₂ | [5] 98²/₃₂ |

Broker arranged for the Bank of the Commonwealth, Detroit, Mich. (hereafter called the Detroit bank), to loan to petitioner $500,000 upon his personal note due June 15, 1962, with the $500,000 U.S. Treasury bonds as collateral, upon prepayment of interest. Petitioner's loan was evidenced by a promissory note dated June 27, 1957, signed by petitioner as maker, which recited that petitioner promised to pay the Detroit bank on June 15, 1962, "Five hundred thousand and no/100—Dollars, $500,000.00-and $48,281.25 Interest," and that "either party has the right to accelerate the maturity of this note after 1/24/58." There was no endorser. No rate of interest was recited and the amount $48,281.25 typed on the face of the note was crossed out as indicated above, but handwritten in ink on the back of the note are the notations: "June 27, 57 Interest Check of $42,557.86 Received. $276.61 rebated by Cashier's Check. Dec 18 1957 [stamped] 12–15–57 cpn applied toward Int. $5625—."

Petitioner also executed, in favor of the Detroit bank, an instrument termed a "Pledge of Collateral" dated June 27, 1957, by which he acknowledged that he had "deposited and pledged" with the Detroit bank "500M United States Treasury 2¼% 6/15/62–59," of which he

---

[4] On the confirmation $463,281.25 was shown as principal and $276.64 as interest, apparently accrued from date of last-due coupon to settlement date.

[5] The parties have stipulated the asked price on January 24, 1958, as 99⁵/₃₂. By reference to other stipulated quotations, the figure appears to be as above.

was owner, as collateral security for payment of his note for $500,000 dated June 27, 1957. The bank was given broad powers of sale of collateral, including the power to become purchaser in event of default in payment when due or when the bank, in the event of depreciation in value of the collateral, among other things, should declare payment to be due. In this event, the bank could declare payment due irrespective of the terms of the note.

By check dated June 25, 1957, petitioner paid the amount of $48,-281.25 to the Detroit bank which was credited on his note for $500,000 dated June 27, 1957.

On January 24, 1958, the Detroit bank purchased from petitioner "at par flat," $500,000 U.S. Treasury 2¼-percent bonds due June 15, 1962, and extinguished petitioner's indebtedness on his note dated June 27, 1957, which was stamped paid and returned to petitioner together with the pledge of collateral signed by him.

The records of broker reflect the loan of $500,000 to petitioner by the Detroit bank with interest (net after rebate of $276.61) of $48,-281.25 and collateral of the $500,000-par-value Treasury bonds, that petitioner's note was to "accelerate on or after 1–24–58," and that a check for $36,442.11 had been sent to petitioner on June 28, 1957.

The Detroit bank sent broker a copy of a deposit ticket dated January 24, 1958, evidencing deposits to the account of Garvin, Bantel & Co. at the Detroit bank of two checks drawn on the latter, each in the amount of $4,218.75, with the following explanations: "Your Commission on the Loan of Bridges Loan called this date" and "Your Commission on the Loan of Burnside Loan called this date." The total amount credited to the account was $8,437.50.

The loan, sale of the Treasury bonds to petitioner, the use of the bonds as collateral, and the purchase of the bonds were accomplished by the following steps: Broker prepared the note in favor of the Detroit bank, the pledge of collateral (which was a printed form), and a typewritten letter of instruction, all for petitioner's signature, and Garvin sent them to petitioner with a transmittal letter dated June 21, 1957, which stated as follows:

At the request of Mr. Edward Burnside I have enclosed herewith the papers necessary to the completion of your purchase of the 500M U.S. Treasury 2¼% bonds and believe you will find the ratio on this to be more favorable than your last transaction.

All the papers are to be signed and returned to me as soon as possible as delivery of the loan is scheduled for June 24th. We will also require your interest check in the amount of $48,557.89 drawn to the order of the Bank of the Commonwealth.

Upon delivery of the bonds, we will forward you our check for $36,442.11. Your Capital Gains will be $36,718.75 and your interest deduction $48,557.11.

We are pleased to again be of service to you.

The typewritten letter of instruction prepared for petitioner's signature read as follows:

P.O. Box 10398
*Charlotte, N.C., June 27, 1956.*

BANK OF THE COMMONWEALTH
*Detroit, Michigan*

GENTLEMEN: On June 24, 1957 will you kindly receive from Garvin, Bantel & Co., or their order, at the First National City Bank of New York, 500M U.S. Treasury 2¼% 6/15/62-59.

This letter will authorize you to detach the coupons as they come due and credit the proceeds as part payment of interest due.

This letter will further serve as your authorization to purchase the above bonds at par Flat, at your option on or after January 24, 1958, the proceeds to be used to discharge my entire indebtedness to your bank without refund of interest.

Very truly yours,

J. HERBERT BRIDGES.

When the prepared papers reached petitioner's office he was out of the city on a vacation, but his name was signed to them by an employee at his instruction and they were returned to broker on June 25, 1957. Garvin received the papers and forwarded them to the Detroit bank but wrote the employee on June 27, 1957, requesting either a power of attorney from petitioner to the employee or petitioner's signature on another set of papers which he enclosed. Garvin at this time advised that he had been in error in requesting a check for interest in the amount of $48,557.86; that interest was to be $48,281.25; and that the Detroit bank would return the difference of $276.61. On June 28, 1957, Garvin sent petitioner the broker's check in his favor in the amount of $36,442.11, "representing the proceeds received upon delivery of your $500,000.00 loan."

Garvin sent the papers to the Detroit bank on June 27, 1957, with a cover letter which read as follows:

Enclosed are the various papers necessary to the Burnside and Bridges loans.

As you see, the notes call for $48,281.25 each in interest. However, in error we requested $48,557.86 each and these were the amounts deposited to your account. Will you be good enough to return the excess payments of $276.61 each.

Of the $48,281.25 received, will you credit our account with $37,500. for each loan. The balance is to be retained by you until maturity at which time $4,218.75 per loan is to be credited to our account.

Hope to have a few more for you, and with best wishes,

The following notations appear on the Detroit bank's copy of the letter:

4218.75 for a/c J. Edward Burnside
4218.75 for a/c J. Herbert Bridges
_____
8437.50

On May 20, 1954, the Detroit bank had purchased five U.S. Treasury 2¼-percent bonds due June 15, 1962–59, each of the bonds having a par value of $1 million. The bonds were held for the Detroit bank by Irving Trust Co. as custodian which received the bonds on May 20, 1954, and debited the amount of the Detroit bank in the amount of $5,074,776.80. The records of the Detroit bank show that, of these bonds, "1,000,000 sold to Garvin, Bantel 6/27/57."

Irving Trust Co. on June 27, 1957, issued to the Detroit bank notice that it had that day received five U.S. Treasury 2¼-percent bonds due June 15, 1962–59, each in the par value of $100,000, to be held for the Detroit bank "a/c J. Herbert Bridges." The notice showed that these five bonds (the numbers of which were shown) had been received from broker and that the account of the Detroit bank was debited in the amount of $500,000. A debit advice was to the same effect. Both the advice and the notice of receipt showed that Irving Trust Co. was acting pursuant to instructions of June 25, 1957.

The Detroit bank completed a printed form, known as "Application for Loan" for its records to reflect the details of petitioner's loan and shows that the loan, offered by broker, was to be due June 15, 1962, but was "CALLABLE BY—EITHER PARTY AFTER SEVEN MONTHS," and that security was "$500M—Bonds—U.S. Treasury 2¼% Due 6–15–59/62 - - - Par. Val. $500,000.00 (Market Value $460,900—)." On the form was typed the following:

*NOTE: These securities are from our own portfolio that we have sold at par. We are obligated to repurchase these same securities at par at the option of either party after seven months.

We are to receive 2¼% coupons on bonds plus accrued coupon interest of $276.64 plus prepaid interest of $6,562.50 making our effective yield approx. 4½%, to call date.

On this form is noted that the note was called and the loan paid as of January 24, 1958.

The Detroit bank also set up a loan and discount ledger card for petitioner's loan. At the heading was noted that petitioner's "note is callable at our option on or after Jan. 24, 1958. Note is to be filed under that date." There are only three entries recorded on the card: The first, dated June 27, 1957, shows balance on note due June 15, 1962, in the amount of $500,000, with interest discounted in the amount of $6,562.50. The second, dated December 18, 1957, shows interest receivable in the amount of $5,625, which resulted from the application of the bond coupons due December 15, 1957, to interest. Irving Trust Co., as custodian, had collected the interest payable on the December 15, 1957, coupons and had credited the amount, $5,625, to the account of the Detroit bank and had issued notice of this credit on December 16, 1957. The third and final entry on the ledger card was dated January 24, 1958, and showed discharge of petitioner's

obligation in the amount of $500,000, and interest receivable in the amount of $1,236.26. The third entry is explained by a notation reading: "Note called as per letter of instructions and bonds purchased by us at par flat with out [*sic*] refund of interest."

On January 24, 1958, the Detroit bank wired instructions to Irving Trust Co. to remove the U.S. Treasury bonds, par $500,000, from the subcollateral account of petitioner and transfer them to the portfolio category of securities held for the Detroit bank and returned the safekeeping receipt.

In answer to an inquiry from an agent of respondent, the Detroit bank replied with regard to petitioner's loan of $500,000, that interest for the period June 27, 1957, to June 15, 1962, amounted to $104,531.25, of which $56,250 represented coupons from petitioner's Treasury bonds, which coupons had been assigned to the bank as part payment of interest, and the remaining $48,281.85 was paid by petitioner; and that the bank had exercised its option to repurchase the bonds on January 24, 1958, and had used the proceeds to liquidate petitioner's loan. The Detroit bank had computed the interest receivable on petitioner's loan to be at a rate between 4¼–4½ percent, a rate within allowable limits.

Petitioner had no contact with the Detroit bank with respect to this loan, except as indicated above. The broker arranged the entire transaction. Petitioner had no agreements with either the bank or the broker other than those reflected in the documents referred to above. The Detroit bank did not refund any interest to petitioner (except, indirectly, the $276.61 initial overcharge) in connection with the above transaction.

On their return for 1957, petitioners claimed a deduction for interest paid the Detroit bank in the amount of $48,281.25. On their return for 1958, petitioners reported a long-term capital gain on the sale of one [6] U.S. Treasury 2¼-percent bond for $500,000 on January 24, 1958, which bond had cost $463,557.89 on June 24, 1957, in the amount of $36,442.11. Long-term capital losses were reported, as was a net long-term capital gain in the amount of $31,696.11, and a net short-term capital gain in the amount of $66.99. They computed tax for 1958 by using the alternative tax.

J. Edward Burnside, to whom reference is made in the foregoing findings, is a personal friend and business associate of petitioner's, and he recommended Garvin, Bantel & Co. to petitioner as a firm with which he had done business in the past. Before entering into the 1956 transaction with the Baltimore bank, petitioner discussed the matter over the telephone with Garvin, who had been requested to call petitioner by one of his friends. Garvin explained the transaction to

---

[6] This was in error; there were in fact five $100,000-par-value Treasury bonds involved in the transaction.

petitioner at this time, and discussed petitioner's potential profit after taxes. Petitioner also discussed the matter with a firm of certified public accountants which regularly did work for his businesses. The firm approved the transaction and advised him to proceed with it. He presented the proposed transaction to his lawyer who told him that it was legitimate and sound and that such transactions were common, but he warned petitioner that he would be liable to the Baltimore bank for any deficiency which might result in the event of sale of the collateral. He discussed the matter with his banker who offered to lend him the money if he wanted, but Garvin, Bantel & Co. had offered to make the arrangements for the loan, and since he knew that that firm was in the business of arranging loans as note brokers he decided to let it proceed. His banker concurred. Petitioner assumed that Garvin, Bantel & Co. made a profit on the sale to him of Treasury notes and bonds. He later learned of its commissions paid by the lenders on his loans.

Petitioner was well acquainted with bank financing and he had considerable personal wealth. Had it been necessary for him to refinance the loan from the two banks, he felt that he could have done so.

Before entering into each of the above transactions petitioner knew of the income tax advantages of being able to deduct amounts paid as interest and report amounts received as long-term capital gain. He did not expect the excess of what would be received on the maturity of the Treasury notes or the resale of the Treasury bonds to exceed or even be equal to the amount of interest he paid on the respective loans. He entered into the transactions simply to make a net profit after taxes. Petitioner had no other purpose in entering into the above two transactions than to make a profit after taxes. As payments of interest, the transactions were shams.

### OPINION.

The only issue is whether the amounts designated as interest and paid by petitioner to the banks in the two transactions described above are deductible as interest under section 163(a) of the Internal Revenue Code of 1954.[7]

Petitioner argues that the transactions were real and bona fide in substance as well as form, that they created binding obligations on petitioner, and that the amounts he paid were in fact interest on genuine indebtedness deductible under section 163(a) and this Court's decision in *L. Lee Stanton*, 34 T.C. 1 (1960). Respondent, in his notice of deficiency, disallowed the deductions on the ground that the

---

[7] SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

amounts do not "constitute an allowable deduction[s] within the intendment of the taxing statutes" and argues on brief that the heart of the controversy is whether, under the basic principles of income tax law, interest paid pursuant to transactions, whether real or sham, which are lacking in economic reality and are engaged in for the sole purpose of creating a tax benefit, is deductible. Respondent argues that for the interest to be deductible the transaction must meet each of three tests:

(1) The transaction was not a sham;

(2) There was no collusion between the parties solely to avoid taxes; in this instance there must be no collusion to give to a payment the appearance of being interest when it was really something else; and

(3) The transaction must not be engaged in solely for tax avoidance purposes.

The language of section 163(a) is concise and clear—it allows a deduction for all interest paid or accrued on indebtedness. The statute says nothing about the motive or purpose for incurring the indebtedness and paying the interest and, except as provided in sections 264–267, which are not pertinent here, makes no requirement with respect to the use to which the borrowed money is put. However, the Supreme Court in *Knetsch* v. *United States*, 364 U.S. 361 (1960), and other courts in numerous cases, some of which are cited herein, have indicated that the statutory allowance presupposes that the indebtedness not be a sham or incurred in a sham transaction. This means that the term "interest" as used in the statute has a commercial connotation, that is, regardless of the purpose for which the money is borrowed or the use to which it is put, and regardless of any tax consequences resulting therefrom, the amounts paid as interest must have commercial reality, there must be some valid commercial reason for paying interest, the borrower must in fact receive something in the transaction itself which would warrant the payment of interest. To be deductible the amounts paid must, in fact, constitute interest—that is, compensation for the use or forbearance of money, *Deputy* v. *du Pont*, 308 U.S. 488 (1940)—paid with respect to genuine indebtedness. *L. Lee Stanton, supra.*

We heartily agree with the concept which has been recognized by the courts at least since *Gregory* v. *Helvering*, 293 U.S. 465 (1935), that a taxpayer has the right to decrease what would otherwise be his taxes by means which the law permits. But the *Gregory* case, as well as the cases cited herein, requires that the reduction be accomplished by means which the statute intended to provide. *Knetsch* v. *United States, supra.* Thus, the determination of whether petitioner's claimed deductions fall within the ambit of the statutory provision requires that we first look beyond the form in which petitioner cast the trans-

actions to see "whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory* v. *Helvering*, *supra; Knetsch* v. *United States, supra; Amor F. Pierce*, 37 T.C. 1039 (1962), affirmed per curiam 311 F. 2d 894 (C.A. 9, 1962) ; *Perry A. Nichols*, 37 T.C. 772 (1962), affirmed per curiam 314 F. 2d 337 (C.A. 5, 1963). Neither the labels which the parties have assigned to the payments nor the bookkeeping entries in their records are conclusive on this point. *George G. Lynch*, 31 T.C. 990 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959).[8]

A careful analysis of the transactions here involved convinces us that the payments made by petitioner to the two banks were not, in fact, interest within the meaning of the statute. In analyzing these transactions for this purpose we have considered each one from its inception until it was closed, as we felt we must to arrive at a correct conclusion.

In the first transaction petitioner ostensibly borrowed $500,000 from the Baltimore bank in September 1956 to buy U.S. Treasury notes having a face value of $500,000, maturing May 15, 1957, with interest coupons detached. For some reason he was able to buy these notes at less than the market value of the notes, even with coupons detached.[9] The bank loan was evidenced by petitioner's note in the principal amount of $500,000 due May 15, 1957, plus interest in the fixed amount of $19,687.50, which he prepaid. The note was secured by a pledge of the Treasury notes as collateral under an agreement which permitted the bank to call for additional collateral if it deemed it necessary to protect the loan. Petitioner paid the broker nothing directly, although it had arranged the entire transaction, drafted all the papers, and presumably sold the Treasury notes to petitioner at less than market value. However, the bank did pay the broker a sizable fee, but the amount of the fee was not equal to the difference between the market price of the Treasury notes and the price for which broker sold them to petitioner. When the Treasury notes matured the bank applied the proceeds to pay petitioner's note in full and the transaction was terminated.

It is obvious that we are not in possession of all the facts which would permit broker, which undoubtedly proposed the transaction to petitioner to make a profit, to sell the Treasury notes to petitioner

---

[8] As a result of our answer to this question, we need not and do not pass on the direct question whether interest paid pursuant to transactions engaged in for the sole purpose of creating a tax benefit is deductible. The majority opinion in *Knetsch* v. *United States,* 364 U.S. 361 (1960), does not seem to have answered this question directly although the dissenting opinion does raise it.

[9] The bid and asked prices on these notes were stipulated to be about 99 *without coupons.* There is no evidence as to who held the coupons. But even if the stipulated prices were for the notes with coupons attached, so that petitioner's purchase price was about what the market price for the notes should have been without coupons attached, it would make no difference in our conclusion.

at an apparent loss. We must assume either that the bank transferred these notes, on paper at least, to broker at petitioner's cost, or that the bank made up broker's apparent loss out of the payment made to it by petitioner. But in any event, so far as petitioner is concerned, he was out of pocket $6,562.50, the difference between the amount he paid the bank ($19,687.50) and the discount at which he purportedly bought the Treasury notes ($13,125). At no time during the period did petitioner acquire and have control of any additional money nor did he have possession or control of the Treasury notes, nor could he collect the interest on the coupons. We have been shown no way in which petitioner could have benefited economically from the transaction except through a tax deduction. In fact, petitioner candidly admitted that such was the situation. It cannot be said that the amount petitioner paid the bank was for the use or forbearance of money.

While it is true that technically petitioner was personally obligated on his note and the bank could have called for additional collateral, there was no reason to think that petitioner could or would have been called upon to pay the note out of his own funds or to put up additional collateral. His note was not due until the Treasury notes matured, which would furnish enough to pay his note in full, and he had prepaid more than a reasonable rate of interest. We are convinced that there was never any intent or thought between the parties that petitioner was incurring a real personal indebtedness or obligation. We are morally certain that petitioner, with his business experience and acumen, would not have entered into such a transaction without even talking to the lender, had this not been understood. The bank was amply secured without it—it was looking to the Treasury notes for repayment of its "loan." We doubt that the bank at any time actually had any of its money out on loan or that its portfolio of Treasury notes actually changed. The transaction merely provided the "facade" of a loan. Certainly so far as petitioner was concerned the transaction did "not appreciably affect his beneficial interest," *Gilbert* v. *Commissioner*, 248 F. 2d 399 (C.A. 2, 1957) (dissenting opinion), except to reduce his cash and reduce his tax. No one, from a strictly commercial standpoint, would have paid "interest" for what petitioner received—nor was there any risk involved on behalf of either the bank or petitioner. As a payment of interest, this transaction was a sham. *Knetsch* v. *United States, supra.* The amount petitioner paid was to purchase an interest deduction and for the privilege of buying the Treasury notes at a discount.[10]

---

[10] See footnote 9.

The second transaction, while somewhat different in form, was the same in substance. In June 1957, petitioner borrowed another $500,000 from a different bank with which he had likewise never done business before, to buy $500,000 face amount of U.S. Treasury bonds, due in June 1962–59, for $463,281.25, which, in this instance, was approximately the market value of the bonds with coupons attached. He gave his personal note in the principal amount of $500,000, due in June 1962, to the bank and pledged the bonds as collateral. Here, too, he agreed to pay the bank a fixed amount, $48,281.25, designated as interest, which he paid in advance. While the bonds had interest coupons attached, petitioner agreed that the bank could collect on the coupons. While the so-called "interest" was purportedly computed to June 1962, the due date of the bonds and petitioner's note, the parties agreed that either party could accelerate the due date at any time after January 24, 1958, with petitioner giving the bank authority and the bank agreeing to purchase the bonds at par flat on or after that date with the proceeds to be used to discharge petitioner's entire indebtedness *without refund of interest*. The "loan" was called on January 24, 1958, the bank did "purchase" the bonds at par and applied the proceeds to discharge petitioner's "indebtedness," and no part of the "interest" was refunded to petitioner. Petitioner paid broker nothing directly but the bank did pay broker a substantial fee.

What we said above in discussing the first transaction is equally applicable to this transaction, except that here petitioner was apparently paying in part for a rigged "sales" price for the bonds, rather than a rigged purchase price, because the market value of the bonds on January 24, 1958, was less than par. However, the evidence with respect to this transaction indicates that the bank sold similar Government bonds to broker at par on the same day broker ostensibly sold the bonds to petitioner at the lower market value but that the bank was obligated to repurchase the bonds at par. The evidence also clearly indicates that the parties intended to close the transaction on January 24, 1958, which resulted in petitioner forfeiting that portion of the "interest" he prepaid applicable to the period from January 24, 1958, to June 15, 1962, the due date of his note.

As a result of this transaction, the bank's position was presumably unchanged, except for the excess of the net amount it received from petitioner after payment of broker's fee ($6,562.50), while petitioner was out of pocket $11,839.14, the difference between the amount he paid the bank ($48,281.25) and his gain on the "sale" of the bonds ($36,442.11). Here again petitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of

the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.[11]

Numerous decisions of this and other courts, rendered both before and after the decision of the Supreme Court in *Knetsch*, denying an interest deduction in cases involving transactions similar to these, but with variations in form, some involving the purported borrowing of funds to purchase Government bonds [12] and others to purchase retirement annuities,[13] support our conclusion here. This case is distinguishable from *L. Lee Stanton, supra,* relied on by petitioner, because in *Stanton* the transactions were admittedly bona fide and real and created a genuine indebtedness, the interest paid was the going rate of interest, and the taxpayer undertook the risk of the rise and fall of the market. See also the distinctions between the *Stanton* facts and the *Knetsch* facts made in the majority opinion in the *Stanton* case. Cases such as *Doyle* v. *Commissioner,* 286 F. 2d 654 (C.A. 7, 1961), reversing a Memorandum Opinion of this Court, involving a short sale of stock, and *Hanover Bank* v. *Commissioner,* 369 U.S. 672 (1962), *Maysteel Products, Inc.* v. *Commissioner* 287 F. 2d 429 (C.A. 7, 1961), reversing 33 T.C. 1021 (1960), and *Fabreeka Products Co.* v. *Commissioner,* 294 F. 2d 876 (C.A. 1, 1961), reversing 34 T.C. 290, *Jack L. Sherman,* 34 T.C. 303, and *Sadie S. Friedman,* 34 T.C. 456 (1960), all involving a deduction for amortization of premiums paid for callable bonds, are also distinguishable from this case not only

---

[11] It should be noted that even if the payment was recognized as interest, that portion allocable to the period between January 24, 1958, and June 15, 1962, cannot be said to be for the use or forbearance of money.

[12] Bond transactions: Prior to *Knetsch*—*Eli D. Goodstein,* 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959),; *Broome* v. *United States,* 170 F. Supp. 613 (Ct. Cl. 1959); *Sonnabend* v. *Commissioner,* 267 F. 2d 319 (C.A. 1, 1959), affirming per curiam a Memorandum Opinion of this Court; *Lynch* v. *Commissioner,* 273 F. 2d 867 (C.A. 2, 1959), affirming 31 T.C. 990 (1959). After *Knetsch*—*Kaye* v. *Commissioner,* 287 F. 2d 40 (C.A. 9, 1961), affirming per curiam 33 T.C. 511 (1959); *MacRae* v. *Commissioner,* 294 F. 2d 56 (C.A. 9, 1961), affirming in part 34 T.C. 20 (1960), certiorari denied 368 U.S. 955, rehearing denied 368 U.S. 1005 (1962); *Rubin* v. *United States,* 304 F. 2d 766 (C.A. 7, 1962); *Perry A. Nichols,* 37 T.C. 772 (1962), affirmed per curiam 314 F. 2d 337 (C.A. 5, 1963); and several Memorandum Opinions of this Court filed in 1962 (*Ronald H. Williams, James A. Dooley, Louis H. Lewis*).

[13] Annuity transactions: Prior to *Knetsch*—*Weller* v. *Commissioner,* 270 F. 2d 294 (C.A. 3, 1959), affirming 31 T.C. 33, and *W. Stuart Emmons,* 31 T.C. 26 (1958), certiorari denied 364 U.S. 908 (1960). After *Knetsch*—*United States* v. *Salley,* 290 F. 2d 708 (C.A. 5, 1961); *United States* v. *Roderick,* 290 F. 2d 823 (C.A. 5, 1961); *William R. Lovett,* 37 T.C. 317 (1961), on appeal (C.A. 5, Feb. 21, 1962),; *Amor F. Pierce,* 37 T.C. 1039 (1962), affirmed per curiam 311 F. 2d 894 (C.A. 9, 1962); *A. A. Helwig,* 37 T.C. 1046 (1962)\; and several Memorandum Opinions of this Court filed in 1962 (*Estate of Charles G. Polacek, J. Leland Anderson, William K. Carpenter, Robert S. Gerstell*).

because they involved different statutes but also because in each of those cases the appellate courts found the transactions to be in substance what they appeared to be in form and to have commercial reality.

Neither of the payments here involved qualifies as interest paid on indebtedness within the intendment of section 163(a) and deduction thereof must be disallowed.

*Decision will be entered for the respondent.*