Hodgman Rubber Company v. Commissioner.
Hodgman Rubber Co. v. Commissioner
Docket No. 94189.
United States Tax Court
T.C. Memo 1963-316; 1963 Tax Ct. Memo LEXIS 31; 22 T.C.M. (CCH) 1658; T.C.M. (RIA) 63316; November 29, 1963
Jack H. Calechman, 85 Devonshire St., Boston, Mass., for the petitioner. Alexander L. Ross, Jr., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax for the years ended December 29, 1957 and January 4, 1959 in the amounts of $30,925.85 and $1,576.19, respectively. Respondent has conceded on brief that petitioner is entitled to a deduction for a charitable contribution to the Mitchell B. Kaufman Foundation in the amount of $25,200 as to the taxable year ended *32 December 29, 1957. Petitioner has not contested adjustments made in regard to Massachusetts excise tax deductions as to each of the years. The remaining issue is whether petitioner properly deducted the sum of $31,534.95 for the taxable year ended December 29, 1957 under section 163, I.R.C. 1954, as prepayment of interest on a bona fide indebtedness. Findings of Fact Some of the facts have been stipulated and are found accordingly. Hodgman Rubber Company, hereinafter referred to as petitioner, is a Massachusetts corporation with principal place of business located at Tripp Street, Framingham, Massachusetts. Petitioner filed its corporate income tax return for the fiscal year ended December 29, 1957 with the district director of internal revenue, Boston, Massachusetts, claiming a deduction in the amount of $31,534.95 as interest paid to Corporate Finance Corporation. At all times material, M. Eli Livingstone was a security dealer in Boston, Massachusetts, doing business under the name of "Livingstone & Company" or "Livingstone Securities Corp." Corporate Finance Corporation, hereinafter referred to as Corporate, is a Massachusetts corporation organized *33 in 1956. As of December 31, 1956, it had 200 shares of capital stock outstanding with a value of $1,000, based on the corporation's only asset, accounts receivable in the amount of $1,000. No additional capital contributions were made in 1957. On April 1, 1957, Corporate had cash available in the total amount of $11,742.36, represented by deposits in its bank accounts. As of December 31, 1957, Corporate had assets and liabilities as follows: Assets
Cash
$ 196,369.91
Accounts receivable, customers
1,423,744.98
Accounts receivable, others
Notes receivable, customers
47,479,833.70
Notes receivable, others
Merchandise
Supplies
Securities (except those issued by
this corporation)
Real estate
Machinery
Motor vehicles and trailers
Equipment and tools
Furniture and fixtures
Prepaid insurance, interest, taxes
60.84
Patent rights, trade-marks, copy-
rights
Goodwill
Treasury stock
Profit and loss (deficit)
Total
$49,100.009.43
Liabilities
Accounts payable
$ 385,599.39
Notes and acceptances payable
13,000.00
Deferred interest
1,948,134.07
Accrued taxes
7,623.25
Mortgages
Bonds, borrowed
46,732,805.96
Reserves
Capital stock with par value
Capital stock without par value
1,000.00
Number of shares without par
value - 200
Surplus
11,846.76
Total
$49,100,009.43
*34 At all times material, Harry N. Cushing, hereinafter referred to as Cushing, a Boston, Massachusetts, attorney and a friend and former law associate of Livingstone, was president and treasurer and one of the shareholders of Corporate. Livingstone was not a shareholder, officer, or director of Corporate. Cushing's law office and the office of Corporate were, during the period in question, located in the same office space at 70 State Street, Boston, Massachusetts. Cushing was also an officer in seven other similar finance companies, namely, Corporate Finance and Loan Corporation, Gail Finance Corporation, Seaboard Investment Corporation, Seaboard Investment Associates, Inc., Cushing Investment Corporation, Suffolk Finance Corporation, and Charleston Investment Corporation, all of which did business in Cushing's offices at 70 State Street, Boston, Massachusetts, and were organized and operated like Corporate. Corporate and the seven similar finance companies received substantially all of their business on reference from Livingstone. Corporate never sought or received a credit report on any person or company with whom it did business. The correspondence of Corporate was typed and *35 prepared on its letterhead stationery by Livingstone's office. Cushing's principal activities as president and treasurer of Corporate were to receive and deposit payments from customers, pay out corporate funds, and maintain the files of the corporation. The tangible assets of Corporate consisted of customers' folders, books and records, a supply of letterhead stationery, and promissory notes executed in its favor by customers. Substantial cash disbursements were made to Livingstone & Company by Corporate during the period from January 1, 1957 through May of 1957. During the period between March 29, 1957 and April 1, 1957, petitioner participated in a series of transactions which are set out below. The use of the words "purchase," "sale," "loan," "interest," "deliver," "payment," and similar terms is for convenience as descriptive of the terms used by the parties and does not constitute a finding as to the actual transaction or its legal efficacy. Livingstone & Company was an active participant in these transactions. It acted as petitioner's broker and also prepared the letters of instruction issued by Corporate. The original form of the letters and documents issued by petitioner *36 were sent to petitioner to be typed in final form and signed. Livingstone sent a letter to petitioner dated March 29, 1957, reciting a purchase by petitioner of $960,000 face amount 2 3/8 percent U.S. Treasury bonds due June 15, 1958, with 6/15/57 and 12/15/57 coupons detached. This letter also recites that petitioner was given an irrevocable option to sell these bonds to Livingstone any time after December 15, 1957 at a price of 99 7/8. Petitioner received a confirmation slip reciting confirmation of a sale by C. F. Childs and Company, hereinafter referred to as Childs, on March 29, 1957, with payment date set for April 1, 1957, to petitioner of $960,000 face amount of 2 3/8 percent U.S. Treasury bonds due June 15, 1958, "[less] value of 2 coupons" for an aggregate purchase price of $933,600 with typed remarks, "Dely Reg * - New York - at Salomon Bros. and Hutzler, a/c Corporate Finance Corp." By letter dated March 29, 1957, from petitioner, Childs was instructed to deliver to Corporate or their order for the account of petitioner $960,000 face amount 2 3/8 percent U.S. Treasury bonds due June 15, 1958, with 6/15/57 and 12/15/57 coupons *37 detached, against payment by Corporate of $933,600. By letter from petitioner bearing the same date, Corporate was instructed to receive from Childs the bonds against payment to Childs of $933,600. The Cash Disbursements Journal of Corporate covering the months of March and April 1957 reflects no payments made to Childs by Corporate in connection with the purchase recited above. Entries in the books and records of Livingstone & Company reflect that on March 29, 1957 Livingstone & Company purchased from Childs two coupons dated 6/15/57 and 12/15/57 on 2 3/8 percent Treasury bonds due June 15, 1958, in the face amount of $960,000, and also that on March 29, 1957 Livingstone & Company sold to Corporate two coupons also due on 6/15/57 and 12/15/57 and which are identified on Corporate's records as the two coupons detached from the "Hodgman Rubber" bonds. By letter dated March 29, 1957 Corporate instructed Childs to deliver to Salomon Bros. & Hutzler, hereinafter referred to as Salomon, for Corporate's account against payment by Salomon to Childs of $954,402.20 both (1) the bonds purchased by petitioner, which Childs was first instructed by petitioner to deliver to Corporate, and *38 (2) the coupons detached therefrom, which were purchased by Corporate from Livingstone & Company and which Childs was also first instructed by Livingstone to deliver to Corporate. By another letter dated March 29, 1957, Corporate instructed Salomon to receive from Childs for Corporate's account $960,000 face amount 2 3/8 percent U.S. Treasury bonds due June 15, 1958, against payment to Childs of $954,402.20. On April 1, 1957, petitioner executed a promissory note in favor of Corporate in the amount of $933,600, with interest at 4 3/4 percent per annum, due December 15, 1957. This instrument was not in the form of a nonrecourse note. On April 1, 1957, a note receivable from petitioner was set up in Corporate's 1957 Note Journal against the liability of Corporate to pay Childs the proceeds of its alleged loan to petitioner. Also on April 1, 1957, Corporate's 1957 Note Journal reflects a transfer of Corporate's obligation to pay Childs to an obligation to pay Salomon, based on the instructions to Childs to deliver the bonds purchased by petitioner to Salomon for the account of Corporate. Petitioner paid the amount of $31,534.95 to Corporate by check dated April 1, 1957. Corporate's *39 1957 Cash Receipts Journal for April 2, 1957 reflects receipt of petitioner's check in the amount of $31,534.95 and receipt of $843.56 from a "Herbert Bremner." A disbursement to Livingstone & Company in the amount of $32,250 on April 4, 1957 is reflected in Corporate's 1957 Cash Disbursements Journal. Corporate received a confirmation slip reciting a purchase on March 29, 1957 by Salomon from Corporate of $960,000 2 3/8 percent U.S. Treasury bonds due June 15, 1958, at 98-23/32 for an aggregate purchase price of $954,402.20, with delivery terms being "4/1/57 IN NY AT C. F. CHILDS." The "Trade No." of this trausaction was "G222A." Entries appearing in Corporate's 1957 Sales Journal and Purchase Journal identify the bonds which Corporate sold to Salomon "short" as being the bonds purchased by petitioner, including the two coupons which Corporate had allegedly purchased from Livingstone & Company. Corporate "financed" its alleged loan to petitioner by simultaneously "selling short" to Salomon U.S. Treasury bonds equal in amount and denomination to the bonds allegedly being purchased by petitioner. Corporate received another confirmation slip reciting a purchase on March 29, 1957 by *40 Salomon from Corporate of $220,000 2 3/8 percent U.S. Treasury bonds due June 15, 1958, at 98-23/32, for an aggregate price of $218,717.17, with delivery terms being "4/1/57 IN NY AT C. F. CHILDS." The "Trade No." of this transaction was "G222B." This transaction did not involve petitioner but involved bonds purchased by "Bremner." By letter dated March 29, 1957, Corporate instructed Salomon to receive for Corporate's account these bonds against payment by Salomon to Childs of $218,717.17. Childs received a confirmation slip reciting a sale by Salomon to Childs of $1,180,000 of 2 3/8 percent U.S. Treasury bonds due June 15, 1958, at 98-24/32, for an aggregate price of $1,173,488.12. The "Trade No." of this transaction was "G223M," and the delivery terms were "4/1/57." The two purchases and one sale described above involving Salomon are reflected on the Cashier's Blotter Records of Salomon. The identical serial numbers of bonds in the face amount of $1,180,000 specified on the back of Salomon's record of the $960,000 face amount purchased and also on the back of Salomon's record of the $1,180,000 face amount sold to Childs show that such bonds ("purchased" by Salomon from Corporate *41 and "sold" by Salomon to Childs) never left the offices of Salomon, nor were they ever in the physical possession of Corporate, Childs, or petitioner. Corporate's 1957 General Journal reflects that on April 1, 1957 Corporate's liability to Childs in the amount of $1,843.75 was eliminated and replaced by a liability to Livingstone & Company in the same amount, with identifying remarks, "Balance due Childs paid by L & Co. a/c Bremner, Hodgman Rubber Co." Petitioner entered into the arrangement upon the advice of its counsel and did not investigate individual aspects of the transaction such as the condition of the bond market, the specific securities, or the use of Corporate as a source of financing. Petitioner contemplated making a charitable contribution or realizing capital gains and was aware of the potential tax benefit of an interest deduction. Petitioner's president and treasurer had previously engaged in securities transactions on his own behalf and on behalf of the corporation and did not always have physical possession of the securities. Petitioner never checked with Corporate to determine whether bonds were being held as collateral. Childs never requested petitioner to *42 pay for the bonds. Prior to the date on which the note was due, petitioner was told that there was pending legislation which might result in the disallowance of deductions in connection with gifts to charities of encumbered securities. Petitioner's note to Corporate became due on December 15, 1957. By letter dated December 16, 1957, petitioner instructed Corporate to deliver $960,000 face amount 2 3/8 percent U.S. Treasury bonds due June 15, 1958 to the First National Bank of Boston, hereinafter referred to as First National, against payment by the bank of $933,600. By letter dated December 16, 1957, petitioner was instructed by Corporate to pay Childs $933,600 for the account of Corporate against delivery by Childs of $960,000 face amount 2 3/8 percent U.S. Treasury bonds due June 15, 1958. Corporate's 1957 Purchase Journal recites a purchase on December 12, 1957 by Corporate from Childs of $960,000 face amount 2 3/8 percent U.S. Treasury bonds due June 15, 1958, which are identified as being for the account of petitioner, thereby incurring a liability of $956,762.63 to Childs. Petitioner borrowed $793,600 without collateral from First National and applied additional amounts *43 of its own funds to pay the note. The custody receipt of First National specifically identifies the serial numbers of the bonds received. By letter dated December 19, 1957, petitioner confirmed sale of the bonds together with the option given petitioner by Livingstone to the Mitchell B. Kaufman Charitable Foundation, an exempt organization under section 501(a) of the Internal Revenue Code of 1954, for $933,850.55 ($933,600 plus accrued interest of $250.55). Petitioner's promissory note in the amount of $793,600 in favor of First National was paid on December 20, 1957. The Mitchell B. Kaufman Foundation exercised the option and sold the bonds to Livingstone Securities Corporation for $959,113.19 ($958,800 plus interest of $313.19), receiving payment on December 20, 1957. Childs then purchased the bonds from Livingstone for $956,263.19. Petitioner claimed a charitable deduction of $25,200 as a result of the bargain sale of bonds to the Foundation on its income tax return for the year ended December 29, 1957. Opinion Acquisition and control of U.S. Treasury bonds by petitioner during the period December 16 to 20, 1957 and the genuineness of petitioner's *44 indebtedness [1] to First National are not questioned. Rather, respondent contends that the "purchase of securities for the account of petitioner at that time does not have any effect or inter-relationship substantively with the sham transactions which transpired eight and one-half months earlier." Petitioner's ability on December 16, 1957 upon payment of $933,600 to acquire possession of bonds which had a market value [2] of about $956,000 was based on the Livingstone option and may be said to have resulted from the $31,000 or so which petitioner paid Livingstone indirectly through Corporate on April 1, 1957. But whether that payment is properly deductible as "interest" on an indebtedness is the question to be decided. Despite the diligent and earnest efforts of petitioner's counsel to distinguish this case, the decision here seems to us to be controlled by the lengthening line of cases dealing with substantially similar situations. Eli D. Goodstein, 30 T.C. 1178 (1958), affd. *45 267 F. 2d 127 (C.A. 1, 1959); Sonnabend v. Commissioner, 267 F. 2d 319 (C.A. 1, 1959), affirming per curiam a Memorandum Opinion of this Court, George G. Lynch, 31 T.C. 990 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959); Knetsch v. United States, 364 U.S. 361 (1960); Perry A. Nichols, 37 T.C. 772 (1962), affirmed per curiam 314 F. 2d 337 (C.A. 5, 1963); Joseph H. Bridges, 39 T.C. 1064 (1963), on appeal (C.A. 4, May 20, 1963). Neither the alleged "purchase" of bonds for the account of petitioner on March 29, 1957 nor the alleged "loan" by Corporate to finance that "purchase" has been shown to have had any substance. The alleged "purchase" was part of a series of intricate steps all taking place in one day and including a "short" sale by Corporate. In fact the bonds never left the possession and control of Salomon. Corporate had no funds [3] to lend, as our findings show, and it did not pay out any nor ever intend to do so. *46 * * * In the instant case, as was true in the above-cited cases in which M. Eli Livingstone was also involved, there was no actual purchase of Government securities, [footnote omitted] petitioners' purported loans from Corporate Finance * * * were wholly lacking in substance since Corporate Finance had no funds to lend, and thus petitioners could not and did not make payments of "interest" on "indebtedness" to Corporate Finance * * * within the meaning of section 163 of the 1954 Code. We think the Commissioner's disallowance of the claimed interest deductions was proper. [Perry A. Nichols, supra at 788.] Had petitioner himself sold the bonds short and immediately thereafter purchased identical bonds, it seems clear that his position could not have been described as the real owner of the property for the purchase of which the indebtedness was ostensibly created. That the "purchase" may have preceded the "short sale" and that the transaction was carried on by Corporate can not transform a paper operation into one having any aspect of reality. Not only was the entire flurry of almost simultaneous documents merely the effectuation of a preconceived plan but, in fact, *47 Corporate and Livingstone were professedly acting for the "account" of petitioner. Since there was no purchase, there was no borrowing and the short sale on the same day in turn repaid the ostensible loan; and, since there was no borrowing, there was no indebtedness upon which interest could be paid. The facts here make peculiarly appropriate what we said in Gordon MacRae, 34 T.C. 20, 27 (1960), affirmed this issue 294 F. 2d 56 (C.A. 9, 1961), certiorari denied 368 U.S. 955, rehearing denied 368 U.S. 1005: * * * The steps taken, each in itself a legitimate commercial operation, were here each mirror images, and add up to zero. The various purchases and sales, each real without the other, neutralize one another and fairly shout to the world the essential nullity of what was done. No purchase and no sale is essentially identical with what was done here, i.e., identical and virtually simultaneous purchases and sales. The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely. That petitioner actually paid all of the so-called "interest" *48 out of its own funds and none was refunded does not distinguish this case from others. See Joseph H. Bridges, supra. Although petitioner urges that this gives the dealings substance, it merely establishes a payment, not that it was for interest on a genuine indebtedness. Petitioner argues that the note it gave was not a nonrecourse note and that, therefore, it stood the risk of loss in the event the bonds decreased in value. Such a decrease was, of course, highly unlikely. The option to sell to Livingstone which resulted from petitioner's "interest" payment guaranteed it against loss. * * * We are convinced that there was never any intent or thought between the parties that petitioner was incurring a real personal indebtedness or obligation. We are morally certain that petitioner, with his business experience and acumen, would not have entered into such a transaction without even talking to the lender, had this not been understood. [Joseph H. Bridges, supra at 1077.] Petitioner insists that it did not investigate Livingstone's operation, that it could assume the bonds were paid for, since Childs made no attempt to collect payment, and that it knew *49 it was entitled to physical delivery of the bonds when the note was discharged. Even if we accept as true the proposition that petitioners were fooled by Livingstone to the extent indicated, the contested deductions cannot stand. No matter what petitioners' intent may have been upon entering the transaction, the transaction itself remains a sham that cannot give rise to valid interest deductions. What was said by the Court of Appeals for the Second Circuit in Lynch v. Commissioner, supra [273 F. 2d 867] at 872, in answer to a contention by the petitioners therein that they, too, were innocent of "the round-robin nature" of Livingstone's dealings, is especially pertinent here. Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers. Cf. MacRae v. Commissioner, supra [294 F. 2d 56 (C.A. 9, 1961)] at 59. The "objective realities" here were that petitioners purchased no Treasury notes, borrowed no funds from Corporate Finance, and paid no true interest on indebtedness. Therefore, regardless of what petitioners may have intended or believed or *50 expected, there can be no interest deductions under the statute. * * * [Perry A. Nichols, supra at 789.] Whether the subsequent transaction in December were undertaken in an attempt to add reality to the earlier transactions, as respondent contends, or to assure a charitable deduction, as petitioner contends, need not concern us. The acquisition of bonds by petitioner on December 16, 1957 was a real purchase for the first time and the reality of its indebtedness and of its control of the bonds at that time can have no retroactive force to give substance to the earlier paper dealings. Amor F. Pierce, 37 T.C. 1039 at 1045 (1962), affd. 311 F. 2d 894 (C.A. 9, 1962), certiorari denied 373 U.S. 912. This case is distinguishable from L. Lee Stanton, 34 T.C. 1 (1960), and Fabreeka Products Company v. Commissioner, 294 F. 2d 876 (C.A. 1, 1961), reversing on other grounds 34 T.C. 290 (1960), Jack L. Sherman, 34 T.C. 303 (1960), and Sadie S. Friedman, 34 T.C. 456 (1960), relied on by petitioner because the transactions there were found not to be mere gestures but to have *51 substance and reality. Decision will be entered under Rule 50. Footnotes
*. Abbreviation not explained.↩
1. Interest on this loan was not disallowed. ↩
2. As demonstrated by the price Corporate paid and Livingstone received. They were redeemed shortly thereafter for $958,800 and interest.↩
3. In answer to respondent's now classic contention that Corporate was without the necessary funds, petitioner says, "It does not necessarily follow that Corporate would have or should have paid Childs any money on taking delivery of the bonds as collateral as long as Corporate had sufficient credit to engage in the transaction without the necessity of using cash." There is no showing that Corporate had sufficient credit, and petitioner, upon whom the burden rests, has wholly failed to produce any such evidence. On the contrary, the facts show that Corporate obtained the necessary funds by simultaneously selling short the very bonds which supposedly it was holding for petitioner.↩